**I.P. LUND TRADING ApS and Kroin Incorporated, Plaintiffs,**

**v.**

**KOHLER COMPANY and Robern, Inc., Defendants.**

**Civil Action No. 97–10427–NG.**

United States District Court, D. Massachusetts.

Feb. 5, 1998.

Cornelius J. Moynihan, Jr., Steven N. Fuller, David H Gibbs, Allison E. Picott, Jason Kravitz, Peabody & Brown, Boston, MA, for Plaintiffs.

Hugh Latimer, Wiley, Rein & Fielding, Washington, DC, Stephen H. Lash, Jager, Smith, Stetler & Arata, Boston, MA, for Defendants.

## *MEMORANDUM AND ORDER*

GERTNER, District Judge.

## TABLE OF CONTENTS
February 5, 1998

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

II. BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115
   A. Characteristics of the Products . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

III. DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116
   A. Preliminary Injunction Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117
   B. Trademarks and Trade Dress . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117
   C. Trade Dress Infringement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119
      1. Is The VOLA Distinctive? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120
         a. Inherently Distinctive Product Design . . . . . . . . . . . . . . . . . . . . . 120
         b. The VOLA Has Acquired Secondary Meaning . . . . . . . . . . . . . . . . . 120
         c. Is There A Likelihood Of Confusion? . . . . . . . . . . . . . . . . . . . . . . 121
            i) Whose Confusion Counts? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121
            ii) Eight–Factor Test For Likelihood Of Confusion . . . . . . . . . . . . . . . . 122
   D. Trade Dress Dilution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124
      1. The Fame And Distinctiveness Of The VOLA Design . . . . . . . . . . . . . . . . . 125
      2. Dilution By Blurring . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125
      3. Blurring Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

IV. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

## I. INTRODUCTION

This case involves the scope of protection accorded trade dress under the new Federal Trademark Dilution Act of 1995 (15 U.S.C. § 1125). I.P. Lund Trading ApS ("Lund") seeks protection for what courts often call a "product configuration," here a bathroom faucet known as the VOLA ("VOLA"). The VOLA was designed by a Danish inventor nearly thirty years ago. Lund has owned and marketed the product since its inception. The faucet is distributed in the United States by Kroin Incorporated ("Kroin"). Defendants Kohler Company ("Kohler") and its subsidiary Robern, Inc. ("Robern"),[1] recently designed a similar product called the Falling Water faucet and started marketing it in 1995.

Plaintiffs seek to enjoin defendants from making, promoting or selling any products having a confusingly similar design to the VOLA, based on sections (a) and (c) of 15 U.S.C. § 1125.[2] The first section, 1125(a),

protects against trade dress infringement, under which the plaintiff is obliged to demonstrate a likelihood of confusion among consumers as to the source of the products.

The second section, 1125(c), protects against trade dress dilution, under the Federal Trademark Dilution Act of 1995. A trade dress dilution claim does not require a finding of a likelihood of confusion among consumers as to the source of the products; rather, it requires that the senior trademark[3] be distinctive and famous, and that the junior mark have the effect of lessening the famous mark's identifying and distinguishing capacities. 15 U.S.C. § 1125(c).

Included in the defendants' briefs is a significant constitutional challenge, but one that cannot be resolved on the papers before me. Defendants argue that the extension of the dilution statute to this trade dress claim is unconstitutional under the Patent Clause of the United States Constitution, U.S.C. Const.

---

1. Throughout this opinion, I treat the defendants collectively as Kohler.

2. Lund specifically moves for an injunction that would enjoin the defendants from: a)using the distinctive VOLA design to promote the sale of Robern and/or Kohler Falling Water products; b)making, promoting, or selling any products incorporating a confusingly similar design to that of the distinctive VOLA design; c)promoting or selling any products that are confusingly similar

to the distinctive VOLA products and which may injure plaintiffs' business reputation or dilute the distinctive quality of said distinctive VOLA design.

3. "Senior" mark is defined as the trademark of comparatively greater recognition, usually because it is first in time or is a stronger mark in the relevant market. "Junior" mark is defined as the trademark of lesser recognition.

art. I, § 8, cl. 8.[4] Such an extension, they suggest, has the effect of providing potentially unlimited protection to the product design of a competitor, and does so without proof of any likelihood of source confusion. The Constitution, defendants argue, mandates that patent protection gives to the "author and inventor" exclusive rights "for limited Times" only. *Id.*

Broadly speaking, the preliminary injunction stage is an inappropriate setting to address such constitutional issues, especially those that are, to a degree, issues of first impression. Accordingly, I invite the parties, and any amici, to file additional memoranda of law on the question of whether the federal dilution statute impermissibly extends patent protection beyond a limited time. A status conference shall be held on February 11, 1998, at 2:00 p.m., in courtroom 4 on the 12th floor, to consider these and other issues.

On the record before me, the plaintiffs' motion for a preliminary injunction based on their claims of trade dress infringement is **DENIED**, as plaintiffs are not likely to show a likelihood of confusion among potential consumers. The plaintiffs motion for an injunction based on their claims of trade dress dilution is **GRANTED**, as plaintiffs are likely to prove dilution by the blurring of the VOLA's trade dress. The constitutional questions are **RESERVED** for further briefing.

## II. *BACKGROUND*

Lund is a family-owned Danish corporation, established in 1873, which manufactures high-end kitchen and bathroom faucets, fixtures, and accessories. The VOLA faucet was designed by the distinguished architect Professor Arne Jacobsen ("Jacobsen") in 1968. It has won numerous design awards, including the Danish ID prize for industrial design innovation, and the Danish Classic ID prize (awarded to products whose designs have survived and thrived for 25 years without significant design modification).

The VOLA faucet design has remained virtually unchanged throughout the past 28 years. Since 1969, the year the VOLA products were introduced, Lund has sold more than 600,000 VOLA faucets throughout the world. The VOLA line serves as Lund's principal source of revenue.

Co-plaintiff Kroin is the sole American distributor for the VOLA, and Kroin's owner, Larry Kroin, was its first American distributor, starting in 1976. Kroin has since sold thousands of VOLA faucets, amounting to approximately $16 million worth of sales. Between 1988 and 1997, Kroin spent more than $684,000 to advertise the VOLA.

Lund has promoted the VOLA faucet across the world, spending more than $10 million since 1980. Most of the advertisements for the VOLA are print advertisements that appear in prestigious design magazines, including *Architectural Record, Interior Design,* and *Interiors.* Hundreds of pictures of the VOLA have appeared as parts of photo spreads in these magazines, and other less specialized magazines, such as *Better Homes and Gardens.*

Kohler, based in Kohler, Wisconsin, is the largest plumbing fixtures supplier in the United States, with more than $1.5 billion worth of sales in 1996 alone. Kohler sells hundreds of different kitchen and bathroom sanitary fitting designs. On November 22, 1994, Kohler's Purchasing Manager, Jeffrey Klosterman, contacted Lund expressing Kohler's "interest[ ] in the possible purchase of this product [the VOLA] and potentially others that you may have ... for resale under our brand name in the United States." The letter further requests volume pricing, and seeks several samples for testing "under United States regulations."

In January, 1995, Kohler purchased from Lund eight VOLA 121 C faucets "to begin qualification testing." According to Kohler, in September, 1995, the company intended to introduce the new "Vessels" basin, a "high-end sink with no holes (as compared to the

---

**4.** The Patent Clause of the Constitution gives Congress the power:
> To promote the Progress of Science and useful Arts, by securing *for limited Times* to Authors
and Investors the exclusive Right to their respective Writings and Discoveries.

U.S. Const. art. I, § 8, cl. 8 (emphasis added).

normal three-hole sink) ..."[5] and sought an accompanying faucet for its product. While the VOLA was compatible with the Vessels sink, Kohler claims that an April 1995 test report showed that the VOLA faucets did not comply with federal and state legal "requirements." Specifically, defendants allege that the VOLA did not meet requirements concerning water flow capacity and resistance to hydrostatic pressure.[6] The plaintiffs dispute these findings, as well as the significance of any such federal, state, or local "requirements."

Robern, before it became a Kohler subsidiary, designed a bathroom sink module which was compatible with the VOLA, known as the MTS Sink Module. Indeed, it sold these modules with VOLA faucets purchased from Kroin. Between January 1993 and September 1995, Robern purchased 218 VOLA faucets directly from Kroin.

In August 1995, Kroin allegedly accused Robern of selling VOLA faucets to Kroin customers for prices lower than what Kroin was charging. Kroin then refused to sell Robern any more VOLA faucets. Shortly thereafter, Kohler acquired Robern. In August, 1996, Robern announced that it would ship MTS Sink Modules with Kohler's Falling Water faucets, which are also compatible with no-hole, freestanding vessel sinks.

The Falling Water faucet was designed by Erich Slothower, a Kohler industrial designer. He testified that while he was aware of the VOLA, and even looked at it carefully before designing the Falling Water, he consciously tried to make his faucet different in appearance than the VOLA.

### A. Characteristics of the Products

At first glance, the Falling Water may seem similar in overall appearance to the VOLA. Similarities between the two faucets include the following: (1) both are single-control, wall-mounted faucets; (2) both control handles utilize a thin cylindrical lever to adjust water temperature and volume; (3) both faucets' spouts and aerator holders are of uniform diameter; (4) both spouts bend downward at right angles softened by a curve; and (5) both faucets offer spouts in almost exactly the same three lengths.

Defendants point to the differences, namely: (1) the Falling Water has a tapered and rounded bonnet on the handle, and when the lever on the bonnet is operated to control the water temperature and volume, the entire bonnet moves with it; by contrast the VOLA handle is shorter, it is a completely uniform cylinder, not tapered, and only the lever moves to control volume, while the lever and cylinder turn clockwise or counter-clockwise to control temperature; (2) the Falling Water's lever is rounded on the top, while the VOLA's lever is flat; and (3) the mounting end of the Falling Water spout also has a tapered, rounded bonnet, mirroring that of the handle and lever, while the VOLA spout has no bonnet.

### III. DISCUSSION

Plaintiffs claim the sale of the Falling Water faucet, and its advertisement in catalogues that also depict the VOLA faucet (indeed, side-by-side), causes confusion among retailers and customers, and dilutes the brand-identity of the VOLA faucet, all in violation of 15 U.S.C. § 1125(a) & (c).

Defendants respond that the majority of sinks in the United States are "three-hole" sinks. Because both the VOLA and the Falling Water faucets require freestanding vessel basins, neither is appropriate for the majority of American homes. To the extent that there is a market for either product, it consists of high-end products purchased mainly by sophisticated consumers. Hence defendants argue there is no likelihood of confusion amongst potential purchasers of these products.

The defendants also contend that the VOLA design is not entitled to trademark protection under 15 U.S.C. § 1125(a): It is not a source indicator or inherently distinctive; nor has it acquired secondary meaning. Even if the VOLA is entitled to protection

---

5. The three holes in the "normal" sink are for the hot and cold spigots, and the water spout.

6. Defendants allege that the VOLA flow rate at 80 pounds per square inch of water pressure is too high for both federal and state standards.

for its design, defendants maintain that this design is not sufficiently "famous and distinctive" within the meaning of 15 U.S.C. § 1125(c) to qualify for protection against dilution.

Finally, the defendants argue that dilution protection should not cover trade dress, especially, where, as here, plaintiffs are competitors of Lund and seeking protection for the design of a like product. The extension of such protection, they argue, violates the Patent Clause of the United States Constitution. · As described elsewhere, I will reserve defendants' constitutional claims for further briefing.

### A. Preliminary Injunction Standard

Before granting the extraordinary relief of a preliminary injunction, I am obliged to consider and balance the following four factors: 1) whether the plaintiff has exhibited a likelihood of success on the merits of its claims; 2) whether the plaintiff risks suffering irreparable injury if the injunction is not granted; 3) whether the public interest will be adversely affected by the granting of the injunction; and 4) given a likelihood of success on the merits, whether the injuries complained of by the plaintiff outweigh harms that granting the injunction would inflict on the defendants. *See TEC Eng'g Corp. v. Budget Molders Supply, Inc.,* 82 F.3d 542 (1st Cir.1996). Of these four factors, likelihood of success on the merits is, in cases such as this, the most significant one. *See, e.g., Keds Corp. v. Renee Int'l Trading Corp.,* 888 F.2d 215, 220 (1st Cir.1989); *Lainer v. Bandwagon, Inc.,* 983 F.Supp. 292, 1997 WL 757567 (D.Mass. Dec. 1, 1997).

In the context of trademarks, if the plaintiffs demonstrate a likelihood of success on the merits, two consequences follow: (1) there is a very strong likelihood that plaintiffs will suffer irreparable injury absent an injunction, *see Omega Importing Corp. v. Petri–Kine Camera Co., Inc.,* 451 F.2d 1190, 1195 (2d Cir.1971) (when likelihood of confusion is shown, and plaintiff would thereby be likely to prevail, "injury irreparable in the sense that it may not be fully compensable in damages almost inevitably follows"); and (2) the granting of a preliminary injunction is presumptively considered to be beneficial to the public interest, "given the societal value of full disclosure and fair competition, together with the policy of the law to provide at least minimal protection to established trade names ...." *Hypertherm, Inc. v. Precision Products, Inc.,* 832 F.2d 697, 700 (1st Cir. 1987); *see also Calamari Fisheries, Inc. v. The Village Catch, Inc.,* 698 F.Supp. 994, 1015 (D.Mass.1988) ("Preventing consumer confusion is clearly in the public interest.") Thus, if the plaintiffs can show a likelihood of success on the merits, either on their trademark infringement or dilution claim, public policy dictates that a preliminary injunction shall issue.

### B. Trademarks and Trade Dress

Federal protection of trademarks has expanded in a number of ways. The original understanding of the word trademark was as a two dimensional symbol (word, name, device or combination thereof) adopted and used by a merchant to identify her goods and distinguish them from articles produced by others. A cause of action for infringement was based on theories of unfair competition. Over time, the concept of a protectable mark was extended by courts to include "trade dress," a three dimensional product design or packaging. The cause of action expanded to one for dilution, focusing on the acts of a non-competitor who tarnished or blurred the distinctiveness of the mark by linking it to unrelated products.

This case involves both a traditional infringement claim as well as one several degrees removed from the traditional—trade dress dilution claims, brought against a competitor, for the design of a similar product. I will briefly describe the evolution of these causes of action.

Prior to the passage of the Federal Trademark Dilution Act, trademarks were protected under section 43(a) of the Lanham Act from infringement only. Infringement suits focused on the acts of competitors diverting sales by "passing off" one competitor's goods as those of another, thereby confusing the public as to the source of the product. The threshold question for a non-registered mark

was whether, in trademark parlance, it was "distinctive." A mark would be considered distinctive when it represented a feature by which consumers "identify and distinguish a product from others," 15 U.S.C. § 1052. Protection was triggered when such a mark was either "inherently distinctive" or when it had acquired distinctiveness, i.e. acquired secondary meaning in the minds of the relevant public. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992); *Lainer*, 983 F.Supp. 292, 297.

Over time, trademark protection was extended to cover not only words or symbols identifying products but also the packaging and even features of the product itself. This concept became known as trade dress, "the design and appearance of [a] product together .with the elements making up the overall image that serves to identify the product presented to the consumer." *Chrysler Corp. v. Silva*, 118 F.3d 56, 58 (1st Cir.1997) (quoting *Fun–Damental Too, Ltd. v. Gemmy Industries Corp.*, 111 F.3d 993, 999 (2d Cir. 1997)) (trademark protection is available for the design of a car, the Dodge Viper).

In *Two Pesos*, 505 U.S. at 773–74, 112 S.Ct. 2753,[7] a case decided prior to the passage of the Federal Trademark Dilution Act, the Supreme Court held that trade dress was as protectable as trademarks in section 43(a) infringement actions. Since *Two Pesos*, 505 U.S. at 773, 112 S.Ct. 2753, most courts,

including the First Circuit, *see Chrysler*, 118 F.3d at 58, have followed suit, eschewing any distinctions between trademarks and trade dress.

Significantly, no court has held that the extension of trademark infringement protection to protection of trade dress in a product's design impinges on the constitutional limitations on design patent protection. *See, e.g., Kohler Co. v. Moen, Inc.*, 12 F.3d 632, 642–43 (7th Cir.1993) ("It is apparent, however, that perpetual trademark protection under the Lanham Act for a product configuration or design *is not the equivalent of impermissible perpetual patent protection*.") (emphasis added); *Esercizio v. Roberts*, 944 F.2d 1235, 1245–47 (6th Cir.1991) (citing cases); *Dorr–Oliver, Inc. v. Fluid–Quip, Inc.*, 94 F.3d 376, 384 (7th Cir.1996) (noting "the delicate interplay of the patent and trademark laws in the context of product configurations").

What the original Lanham Act did not cover were the actions of non-competitors appropriating a famous mark.[8] Such actions would obviously not deceive or confuse customers purchasing the goods designated by famous marks; typically, different products were involved.[9] Nevertheless, courts in various countries and statutes in individual states recognized that the appropriation of a well-known mark could give a non-competitor an unfair and unearned advantage in the marketplace.[10] As a result, the initial mark

---

7. As the Supreme Court said in a recent opinion, "[s]ince human beings might use as a 'symbol' or 'device' almost anything at all that is capable of carrying meaning, this language, read literally, is not restrictive." *Qualitex Co. v. Jacobson Products Co., Inc.*, 514 U.S. 159, 162, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995).

8. *See Exxon Corp. v. Oxxford Clothes XX, Inc.*, 109 F.3d 1070, 1076 (5th Cir.1997), *reh'g en banc denied*, (1997) (noting that "a federal cause of action for trademark dilution was apparently not available until the Lanham Act was amended to include one in 1996." *See* 15 U.S.C. § 1125(c), added by Pub.L. No. 104–98, § 3(a) (1996)); *Community Fed. Savings & Loan Assoc. v. Orondorff*, 678 F.2d 1034, 1036 n. 7 (11th Cir.1982) (no independent cause of action for dilution under federal trademark law); *R.G. Barry Corp. v. Mushroom Makers, Inc.*, 612 F.2d 651, 658 (2d Cir.1979).

9. Traditionally, dilution analysis would, as the Act's legislative history makes clear, involve a trademark being used for a different product, for example, Buick aspirin or Kodak pianos. H.R.Rep. No. 104–374, 104th Cong., 1st Sess. (1995), at 3, (citing "DUPONT shoes, BUICK aspirin, and KODAK pianos" as examples of potential dilution. The same examples were cited by the Second Circuit in *Hormel*, 73 F.3d at 506, referring to the legislative history of New York's anti-dilution statute, 1954 N.Y. Legis. Ann. 49–50).

10. *See* Alexander and Heilbronner, *The Lanham Act After Fifty Years: Dilution Under Section 43(c) of the Lanham Act*, 59–SPG Law & Contemp. Probs. 93, 94 (1996); Susan L. Serad, *One Year After Dilution's Entry Into Federal Trademark Law*, 32 Wake Forest L.Rev. 215, 216 (1997). *See generally Exxon*, 109 F.3d at 1081 (noting that twenty-six states have anti-dilution statutes); *Ringling Bros.-Barnum & Bailey Com-*

would be "diluted," disassociated from the product in connection with which it had been used.

With the passage of the Federal Trademark Dilution Act,[11] the Lanham Act finally protects against dilution. Section 43(c) permits the owner of a "famous" mark to obtain injunctive relief against uses of its mark which either tarnish or blur its distinctiveness. Consistent with dilution theory, 15 U.S.C. § 1127 does not require a showing of a likelihood of confusion, mistake or "deception." Nor does it matter if the products at issue belong to a non-competitor. Congress defined dilution such that it may now be found regardless of the "presence or absence of ... competition between the owner of the famous mark and other parties." 15 U.S.C. § 1127.

Defendant Kohler argues that trade dress dilution extends the Lanham Act, and even dilution theory, far beyond their original boundaries by providing: (1) protection for a product design (2) to similar products of competitors, (3) married to a theory that could be more diffuse than an infringement theory, namely one that does not even require proof of consumer confusion, (4) for an unlimited period of time. The Constitution's Patent Clause, after all, specifies protection for "limited Times" only. U.S. Const. art. I, § 8, cl. 8.

Lund replies that the extension is appropriate; the case law made no distinctions between the protection of trademarks and trade dress prior to the passage of the Dilution Act. This issue, plaintiffs argue, has already been decided against the defendants, citing, for example, *Kohler*, 12 F.3d 632. Plaintiffs contend that if product configurations are protectable as trademarks, *id.*, and dilution protection extends to famous marks, then § 1125(c) covers their claim that the VOLA's trade dress has been diluted by Kohler's Falling Waters faucet.

*bined Shows, Inc. v. Utah Div. of Travel Dev't,* 955 F.Supp. 605, 613 (E.D.Va.1997).

11. The Dilution Act is set forth in a new Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c), and in a new definitional section of Section 45 of the Lanham Act, 15 U.S.C. § 1127.

■ On this truncated record, I am obliged to agree with the plaintiffs. The case law describes trade dress protection broadly. *See Kohler*, 12 F.3d at 643; *Two Pesos*, 505 U.S. at 773, 112 S.Ct. 2753 ("protection of trademarks and trade dress under § 43(a) serves the same statutory purpose of preventing deception and unfair competition"). The sole court to have addressed the question of whether the dilution statute applies to a product's design and configuration has extended the Act's trade dress protection. *Sunbeam Products, Inc. v. West Bend Co.*, 1996 WL 511639, at *13 (S.D.Miss. May 3, 1996), *aff'd*, 123 F.3d 246, 261 (1997)(finding "Mixmaster" blender's design as a whole to be protected against trade dress dilution). While there may be constitutional questions about such protection as applied to the facts of the case at bar, those concerns must wait for another day.

## C. *Trade Dress Infringement*

The VOLA design is not registered. The relevant portion of the Lanham Act, 15 U.S.C. § 1125(a), creates a cause of action for trademark infringement of unregistered marks as follows:

Under this section, plaintiff is required to prove the following three elements to succeed in an infringement suit: (1) the ownership of a distinctive mark entitled to trademark protection; (2) the use of that [mark] in interstate commerce; and (3) its use by another in a manner likely to cause confusion as to the origin of the goods or services.

*Calamari Fisheries*, 698 F.Supp. at 1006 (citation omitted).

The defendants concede that the plaintiffs are using the VOLA faucet design in interstate commerce. They contest whether this design is distinctive, either inherently or through the acquisition of secondary meaning.[12] *Two Pesos*, 505 U.S. at 769, 112 S.Ct. 2753. In any event, whether distinctive or

12. No one argues that the VOLA design is "functional," as that term is used in trademark law. *See Two Pesos*, 505 U.S. at 769, 112 S.Ct. 2753; *Qualitex*, 514 U.S. at 165, 115 S.Ct. 1300 (discussing functionality doctrine).

not, defendants argue that the Falling Water faucet is not likely to cause confusion among relevant consumers as to the source of either faucet, or the VOLA's sponsorship by Lund.

### 1. Is The VOLA Distinctive?

#### a. Inherently Distinctive Product Design

■ There were two ways of establishing that a mark is distinctive: (1) that it is "inherently" distinctive;[13] or (2) that it has acquired distinctiveness, i.e. by acquiring among the relevant consumers a secondary meaning. As one commentator has described it:

> The inherent distinctiveness analysis is prospective, even speculative. It is a predictive inquiry. In contrast, the secondary meaning inquiry focuses on evidence of actual consumer association. Another difference is that, in temporal terms, because inherent distinctiveness can be presumed immediately upon use, it affords instant protection. Secondary meaning takes time to develop. Even if it is inferred circumstantially, proof of secondary meaning must await the development of the evidence from which it can be inferred, and thus, protection is not available upon first use.[14]

The Supreme Court in *Two Pesos* held that trade dress could also be judged by the "inherently distinctive" test without requiring a showing of the acquisition of secondary meaning. *Id.* at 505 U.S. at 774–76, 112 S.Ct. 2753.[15] In pure product configuration cases, "inherently distinctive" status is attained if the design is "likely to serve primarily as a designator of origin of the product,"

*Knitwaves, Inc. v. Lollytogs Ltd. (Inc.),* 71 F.3d 996, 1008 (2d Cir.1995) (quoting *Duraco Products, Inc. v. Joy Plastic Enterprises, Ltd.,* 40 F.3d 1431, 1440–41 (3d Cir.1994)).[16] No Court in this Circuit, including *Lainer,* 983 F.Supp. 292, 299, has adopted a different standard.

■ However, if Lund's design objective was "primarily aesthetic," as the plaintiffs admit of the VOLA, then the VOLA's design does not meet the test. As such, it is not "primarily" intended as source identification.[17] *Knitwaves,* 71 F.3d at 1009; *see also Atlantis Silverworks, Inc. v. 7th Sense, Inc.,* 42 U.S.P.Q.2d 1904, 1997 WL 128403, at *3 (S.D.N.Y. March 20, 1997) (holding that where a product's "design inherently is primarily aesthetic" and "[e]specially in the absence of evidence that the plaintiff chose the design to indicate origin, it lacks the distinctiveness to qualify for trade dress protection.")

Thus, I conclude that, on this record, the design of the VOLA faucet cannot be considered inherently distinctive, within the meaning of trademark law.

#### b. The VOLA Has Acquired Secondary Meaning

■ Although the VOLA faucet is not inherently distinctive, I agree with the plaintiffs that it has acquired secondary meaning. The establishment of secondary meaning in a product design is an issue of fact. *See Volkswagenwerk Aktiengesellschaft v. Rickard,* 492 F.2d 474, 477–78 (5th Cir.1974). In order to determine whether a plaintiff has established secondary meaning in a mark "it is

---

13. Trademarks are considered inherently distinctive when "their intrinsic nature serves to identify a particular source of a product." *Two Pesos,* 505 U.S. at 768, 112 S.Ct. 2753.

14. Graeme B. Dinwoodie, *Reconceptualizing the Inherent Distinctiveness of Product Design Trade Dress,* 75 N.C. L.Rev. 471, 487 (1997).

15. This holding was qualified by the Court in its more recent decision in *Qualitex,* which held that if color alone is to function as a trademark (or as trade dress), 514 U.S. at 166, 115 S.Ct. 1300, it must have "attained 'secondary meaning'" such that it "identifies and distinguishes a particular

brand (and thus indicates its 'source')." *Id.* at 163, 115 S.Ct. 1300.

16. According to the Federal Circuit, "the focus of the inquiry is whether or not the trade dress is of such a design that a buyer will immediately rely on it to differentiate the product from those of competing manufacturers." *Tone Bros., Inc., v. Sysco Corp.,* 28 F.3d 1192, 1206 (Fed.Cir.1994).

17. The VOLA would also fail under the test set out by the Third Circuit in *Duraco:* A product feature or configuration of features must be "conceptually separable from the product, so that a consumer will recognize its symbolic (signifying) character." 40 F.3d at 1449.

appropriate to consider (1) the length and manner of its use, (2) the nature and extent of advertising and promotion of the mark and (3) the efforts made in the direction of promoting a conscious connection, in the public's mind, between that name or mark and a particular product or venture." *Id.* (quoting *Rickard,* 492 F.2d at 478, (citing 3 Callman, *Unfair Competition, Trademarks, and Monopolies,* § 19.27 (4th ed.1983))).

Recently, courts have considered whether a product feature is identified by "the more stringent 'primary significance' standard." *Thomas & Betts Corp. v. Panduit Corp.,* 65 F.3d 654, 661 n. 8 (7th Cir.1995). Indeed, both the *Qualitex* and *Two Pesos* Courts held, quoting *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982), that " 'secondary meaning' has been acquired when 'in the minds of the public, the *primary significance* of a product feature ... is *to identify the source of the product* rather than the product itself.' " *Qualitex,* 514 U.S. at 163, 115 S.Ct. 1300 (emphasis added); *Two Pesos* 505 U.S. at 767 n. 4, 112 S.Ct. 2753.[18]

■ Lund has been using essentially the same design for the VOLA since 1969. To many interior designers and magazine editors, the VOLA is known as a "Kroin faucet." The VOLA is on display in Design Collections in museums such as the Museum Of Modern Art ("MoMA"), in New York City, where it was once for sale in the museum .shop. Whether it is called the Kroin faucet, or the VOLA (or the Jacobsen, after the architect who designed it), there is sufficient evidence in the. record for me to conclude that purchasers of high-end bathroom fixtures, including interior designers, now know the VOLA by sight. Consumers are moved to purchase the VOLA not just because it looks good, but because its design conveys status related to its unique source.[19]

Defendants argue that because the VOLA is known by many names, the mark, in this case its design, does not serve primarily to indicate a single, unique origin or sponsor of the product. At this point in time, defendants' argument is not persuasive.[20] *See TEC Eng'g Corp.* 927 F.Supp. at 534 (D.Mass.1996) (citing *Essie Cosmetics, Ltd. v. Dae Do Int'l, Ltd.,* 808 F.Supp. 952, 959 (E.D.N.Y.1992) (where there are different trade names for a given product, the inquiry remains whether such sales "dilute the inference of its origins")). Enough money and effort has been invested in promoting the VOLA's design that it is recognizable as coming from a unique source, albeit through a variety of distributors. In short, whatever people may call the VOLA, the primary significance of the VOLA design, to the relevant public, is as a high-end product, coming from Lund.[21]

### c. *Is There A Likelihood Of Confusion?*

#### i) *Whose Confusion Counts?*

The third prong of the trademark/trade dress infringement test requires a showing

---

**18.** Thus, as the Tenth Circuit held in *Vornado Air Circulation Systems v. Duracraft Corp.,* "mere association" between a product's design and its source is insufficient to establish secondary meaning; rather, the "primary significance of the design in the consumer's mind" must be "as a brand identifier." 58 F.3d 1498, 1502 n. 7 (10th Cir.1995), *cert. denied,* 516 U.S. 1067, 116 S.Ct. 753, 133 L.Ed.2d 700 (1996).

**19.** There are two other factors which courts often address in determining the existence of secondary meaning: whether the junior user of the mark intentionally copied "down to the smallest detail" the senior user's mark, *TEC Engineering,* 927 F.Supp. at 534, and survey evidence. The parties dispute whether the Falling Water is a slavish copy of the VOLA, so I do not rely on copying in reaching the conclusion that the VOLA has acquired secondary meaning. The "consumer surveys" conducted by the plaintiffs consist of a few interviews, with no scientific precision, making them equally unreliable as evidence of secondary meaning.

**20.** *See Centaur Communications, Ltd. v. A/S/M/ Communications, Inc.,* 830 F.2d 1217, 1221 (2d Cir.1987) ("the crux of the doctrine of secondary meaning is that the mark comes to identify not only the goods but the source of those .goods, even though the relevant consuming public might not know the name of the producer") (citation and internal quotation marks omitted).

**21.** It does not matter that the VOLA is also aesthetically pleasing, *see Roberts,* 944 F.2d at 1240–41. Just as the shape of a Ferrari is identified in the minds of potential Ferrari customers as being a Ferrari, whatever. the implications may be, the shape of the VOLA triggers in the mind of potential purchasers, namely those who might buy high-end bathroom fixtures, that this faucet is made by a single source. *See id.*

that the infringing mark's use is likely to cause confusion. *Dorr–Oliver, Inc. v. Fluid–Quip, Inc.*, 94 F.3d 376, 381–82 (7th Cir. 1996), the court held that the confusion inquiry "centers on the confusion of consumers *in the market for the particular products at issue.*" (emphasis added) The First Circuit has implicitly followed the *Dorr–Oliver* focus on potential purchasers by examining the context in which potential consumers encounter the trademarks. *See, e.g., Int'l Ass'n of Machinists and Aerospace Workers, AFL–CIO, v. Winship Green Nursing Ctr.*, 103 F.3d 196, 201 (1st Cir.1996) (holding that "because the listed factors must be evaluated in context, any meaningful inquiry into the likelihood of confusion necessarily must replicate the circumstances in which the ordinary consumer actually confronts (or probably will confront) the conflicting mark") (citations omitted).[22]

■ The facts of the case at bar make it more like *Winship Green, id.*, and *Dorr–Oliver*, 94 F.3d at 381–82,[23] than cases with broad classes of potentially confused customers. As noted above, the market for high-end bathroom fixtures, such as the VOLA, which are compatible with freestanding, no-hole, "vessel" sinks, is limited. Prospective purchasers of such faucets are, according to evidence introduced by both sides, fairly sophisticated. *See Astra Pharm. Products, Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1206 (1st Cir.1983). I conclude that the

analysis of whether a likelihood of confusion exists must "be determined with reference to the realities of consumer behavior in the relevant market." *Dorr–Oliver*, 94 F.3d at 381 (citations omitted); *Winship Green*, 103 F.3d at 201; *Calamari Fisheries*, 698 F.Supp. at 1009 (quoting *Alpha Industries*, 616 F.2d at 444).[24]

With this framework, I turn then to an application of the well-established eight-factor test first set out by the First Circuit in *Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482, 487 (1st Cir. 1981).

## ii) *Eight–Factor Test For Likelihood Of Confusion*

The *Pignons* test includes the following non-exhaustive list [25] of factors to assess the "likelihood of confusion":

> the similarity of the marks; the similarity of the goods; the relationship between the parties' channels of trade; the relationship between the parties' advertising; the classes of prospective purchasers; evidence of actual confusion; the defendants' intent in adopting its mark; and the strength of the plaintiff's mark.

657 F.2d at 487; *see also Astra*, 718 F.2d at 1205 (enumerating the *Pignons* test, noting these factors are "to be used as *guides* in assessing the likelihood of confusion") (emphasis added).

22. The Sixth Circuit, however, in *Esercizio v. Roberts*, held that since Congress deleted the words "purchasers" from the Lanham Act in 1967, the Lanham Act protects against potential confusion on *anyone's* part, regardless of whether they might ever purchase the product which the mark identifies. 944 F.2d at 1244–45. This is a broad reading of 15 U.S.C. § 1125(a), given the purposes of trademark law, namely to protect consumers and producers pursuant to Congress's commerce powers under the Constitution. *See Trade–Mark Cases*, 100 U.S. 82, 96–97, 25 L.Ed. 550 (1879).

Following *Roberts*, the First Circuit addressed, in passing, post-sale confusion by "viewers who have an interest from the standpoint of the original creator's reputation and may be misled." *Chrysler*, 118 F.3d at 59. The *Chrysler* court did not explore in depth what "interest" post-sale "viewers" might have. *Id.*

23. In *Dorr–Oliver*, the court noted that "[t]he proper examination is not whether some people *viewing* clamshells in industry plants might be

confused, but rather whether *consumers in the market* for clamshells are likely to be confused." 94 F.3d at 382 (emphasis added).

24. And while the likelihood of post-sale confusion must be examined, *Chrysler*, 118 F.3d at 59, it can be viewed through a focused lens of inquiry as to whether *consumers in the market* for high-end sanitary fittings are likely to be confused as to source or sponsorship. *Dorr–Oliver*, 94 F.3d at 382.

25. As the First Circuit noted recently in discussing the "eight-factor" test, "this compendium does not conform easily to the peculiar facts of this case, [and] it is not intended to be either all-encompassing or exclusive." *Winship Green*, 103 F.3d at 201 (citing *DeCosta v. CBS, Inc.*, 520 F.2d 499, 513–14 (1st Cir.1975), *cert. denied*, 423 U.S. 1073, 96 S.Ct. 856, 47 L.Ed.2d 83 (1976)).

■ Applying the *Pignons* test to the case at bar, it is apparent that the strength of the VOLA mark and the similarity of the goods (almost identical lavatory faucets) weigh in favor of a finding of confusion. Four other factors, however, weigh in favor of the defendants and a finding of no confusion: the classes of prospective purchasers, the channels of trade, the extent to which the marks can be distinguished by sophisticated consumers, and the defendants' intent.

As the *Astra* court held, the inquiry concerning classes of prospective purchasers can be "critical." 718 F.2d at 1206. "If likelihood of confusion exists, it must be based on the confusion of some relevant person; i.e., a customer or purchaser." *Id.* Thus, "a court called upon to assay likelihood of confusion must ponder the sophistication of the class, thereby taking account of the context in which the alleged infringer uses the mark." *Winship Green*, 103 F.3d at 204 (citing *Astra*, 718 F.2d at 1206–07). According to the evidence offered by both sides, people who purchase high-end faucets tend to use interior designers, who, in turn, are more likely to be aware of the differences between the two products. Moreover, potential purchasers of either faucet are unlikely to install the products themselves. Given the nature of the market, somewhere along the line, the person responsible for the purchase is likely to know that what they are getting is a Kohler faucet as opposed to a VOLA, a fact which weighs in favor of the defendants. Likewise, both products are sold through similar channels of trade by distributors aware of the differences between the two faucets.

■ The dissimilarity of the marks, particularly to the sophisticated market, is a third factor in favor of a finding that there is no likelihood of confusion. Despite superficial similarities, the rounded and tapered bonnets on the Falling Water, and the operation of its handle, described elsewhere, constitute obvious differences. Applying the *Pignons* court's observation on similarity, "that in certain circumstances, otherwise similar marks are not likely to be confused where used in

conjunction with the clearly displayed name and/or logo of the manufacturer," 657 F.2d at 487, I am unpersuaded that point-of-purchase consumers will confuse the Falling Water for the VOLA. This finding is supported by the fact that the housemarks, VOLA and Kohler, are clearly dissimilar and prominently displayed on each product.[26] *See R.G. Barry Corp. v. A. Sandler Co.*, 406 F.2d 114, 116 (1st Cir.1969) (finding conjunction of housemark with contested trademark to be of "exceptional significance").

It is equally unlikely that potential purchasers will choose not to purchase the senior users' product (VOLA) because they believe that the senior user is also sponsoring the junior users' product (Falling Water). *See id.; Roberts*, 944 F.2d at 1244 (citing *Rolex Watch, U.S.A., Inc. v. Canner*, 645 F.Supp. 484, 492–95 (S.D.Fla.1986)). According to plaintiffs' expert, whom I credit, consumers confronted with the Kohler Falling Water faucet assume that it is a "knock-off," and do not assume that either Lund or Kroin are sponsoring this competing product.

As far as post-purchase confusion is concerned, *see Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 872 (2d Cir.1986), these faucets are called "fixtures" for a reason. They are generally purchased only once and there is little or no chance that they will be resold to unwary consumers.

The defendants' intent is a fourth factor weighing against a finding of confusion. The plaintiffs contend that the defendants intentionally copied their product: Kohler purchased eight VOLA faucets for testing, and the Falling Water's designer, Erich Slothower, acknowledged that he looked at the VOLA before designing the Falling Water. More persuasive, however, was Slothower's testimony that he was intentionally trying *not* to copy the VOLA. The added bonnets and other rounding features of the Falling Water, compared to the VOLA's flat, cylindrical design, support Slothower's testimony.

Two additional factors support neither the plaintiff nor the defendant: purported evi-

**26.** "Similarity of the marks must be considered in light of what occurs in the marketplace, taking into account the 'circumstances surrounding the purchase of the goods' or services." *Calamari Fisheries*, 698 F.Supp. at 1009 (quoting *Alpha Industries*, 616 F.2d at 444).

dence of actual confusion and the parties' advertising. Plaintiffs do not, at this preliminary stage, need to present any evidence of actual confusion, since such a showing "is not essential in order to find a likelihood of confusion." *Wheeler,* 814 F.2d at 818 (citations omitted). And while plaintiffs do present some evidence of actual confusion in the form of affidavits and expert testimony, the defendants rightly note that no scientific method was used in conducting these "surveys." This sort of "lone inquiry does not indicate probable confusion of an appreciable number of purchasers," *see Winship Green,* 103 F.3d at 205 (citation omitted), a fact which favors neither party. Nor can I discern any confusion through advertising. While the parties may advertise in the same magazines, the Falling Water faucet is clearly identified as being made by Kohler.[27]

Ultimately, the aspects of the VOLA that make it protectable, the secondary meaning it has achieved in terms of design awards and prestige, also make it likely that those who desire the VOLA will be able to identify and purchase one. I conclude that under "the circumstances in which the ordinary consumer actually confronts (or probably will confront) the conflicting mark," *Winship Green,* 103 F.3d at 201, the plaintiffs have not met their burden of demonstrating a likelihood of confusion concerning association, origin, or sponsorship. Accordingly, the plaintiffs' claim fails with respect to trademark and trade dress infringement under either theory of 15 U.S.C. § 1125(a).

### D. *Trade Dress Dilution*

15 U.S.C. § 1125(c)(1) provides:

The owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark, and to obtain such other relief as is provided in this subsection.

Dilution, unlike infringement, does not require a showing of a likelihood of confusion, mistake, or deception. 15 U.S.C. § 1127 (definition of "dilution"). The statute says only that:

The term "dilution" means the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of—

(1) competition between the owner of the famous mark and other parties, or

(2) likelihood of confusion, mistake, or deception.

Dilution is, as courts have observed, a " 'somewhat nebulous concept' and ... its application involves navigating in the 'murky waters' of anti-dilution analysis." *Ringling Bros.,* 955 F.Supp. at 613 (citations omitted). Analysis of claims made under the new federal anti-dilution statute may, in part, "mirror[ ]" the murkiness of traditional state law dilution analysis. *See Clinique Labs., Inc. v. Dep Corp.,* 945 F.Supp. 547, 561 (S.D.N.Y. 1996).

In a federal dilution action, the plaintiff bears the burden of proving: "(i) that it owns a famous mark, (ii) that the defendant adopted its mark after the plaintiff's mark became famous, and (iii) that defendant's mark dilutes the famous mark." *Ringling Bros.,* 955 F.Supp. at 613. Defendants do not contest factor (ii) that they adopted their mark after the VOLA had achieved whatever level of fame it has received, nor that Lund owns the VOLA mark. The two issues before me are: (1) whether the VOLA is a "famous mark," within the meaning of the statute; and (2) whether the Falling Water faucet lessens the capacity of the VOLA to identify and distinguish its source. 15 U.S.C. §§ 1125(c) & 1127.

While, as I have found, the public may not be confused as to the *source* of these faucets, the similarities between the Falling Water faucet and the VOLA may result in a lessening of the VOLA's capacity to identify and distinguish Lund's faucet from those of competitors. More simply, an individual could

---

**27.** There is at least one Robern brochure that depicts both Kohler's Falling Water faucet and the VOLA. Neither faucet is listed as a product for sale, however, since only the sinks, cabinets, and other accessories are being advertised or sold thereby, not the faucets.

deliberately purchase a Falling Waters faucet, knowing what it is, precisely because it looks like a VOLA, for any number of reasons.[28]

### 1. The Fame And Distinctiveness Of The VOLA Design

■ The statute provides a non-exhaustive list of factors which a court may consider in determining whether a mark is both distinctive and famous. These are:

(A) the degree of inherent or acquired distinctiveness of the mark;

(B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used;

(C) the duration and extent of advertising and publicity of the mark;

(D) the geographical extent of the trading area in which the mark is used;

(E) the channels of trade for the goods or services with which the mark is used;

(F) the degree of recognition of the mark in the trading areas and channels of trade used by the mark's owner and the person against whom the injunction is sought;

(G) the nature and extent of use of the same or similar marks by third parties; and

(H) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

15 U.S.C. § 1125(c)(1). I have already considered many of these factors in deciding the trademark infringement claims: the VOLA mark is strong, and has acquired secondary meaning in its market; and it has been used for some twenty years in this country. Thus, in its market, the VOLA's design is famous and distinctive.[29]

### 2. Dilution By Blurring

The two kinds of dilution historically recognized by state anti-dilution statutes are blurring and tarnishing. See, e.g., Mead Data Cent. v. Toyota Motor Sales, U.S.A., Inc., 875 F.2d 1026, 1031 (2d Cir.1989) (applying New York anti-dilution statute to the difference between LEXUS and LEXIS and holding that the senior mark would not be diluted). Plaintiffs do not claim that the Falling Water in any way "tarnishes" the affirmative associations consumers may have with the VOLA; their argument stands or falls on the proposition that their mark will be blurred.

■ At the most general level, blurring is "concerned with an injury to the mark's selling power ...." Clinique, 945 F.Supp. at 561; Ringling Bros., 955 F.Supp. at 614 (noting that blurring is different from "source confusion"). Blurring occurs "where the defendant uses or modifies the plaintiff's trademark to identify the defendant's goods and services, raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product." Hormel Foods Corp. v. Jim Henson Productions, Inc., 73 F.3d 497, 506 (2d Cir.1996) (quoting Deere & Co. v. MTD Prods., Inc., 41 F.3d 39, 43 (2d Cir.1994)); see also H.R.Rep. No. 374, 104th Cong., 1st Sess. at 2 (1995), reprinted in 1995 U.S.C.C.A.N. 1029, ("The purpose of [§ 1125(c) ] is to protect famous trademarks from subsequent uses that blur the distinctiveness of the mark ... even in the absence of a likelihood of confusion."). Indeed, Congress simply defined dilution as a lessening of the capacity of the famous mark to distinguish and identify goods "regardless of the presence or absence of—(1) competition between the owner of the famous mark and other parties ...." 15 U.S.C. § 1127 (emphasis added).[30]

---

28. Where once the VOLA design sold itself, now plaintiff argues that the VOLA design is helping to sell Falling Water faucets, and as a result, the design's selling power is diminished.

29. Fame, applied to this case, is best understood in the context of the channels of trade of the mark, and perhaps also in the junior user's channels of trade. The distinctive qualities of a mark are relevant mainly to the market for the product, or similar markets (such as the market for

kitchen faucets); the fame of the mark in a product's market, encompassed in the "owner's quasi-property right" in the mark itself, is protected by the Federal Dilution Act. See Ringling Bros., 955 F.Supp. at 614 n. 7.

30. While blurring often referred to cross-product confusion under state law, the federal law now plainly extends it to similar products. Cross-product confusion is not at issue here, although it is addressed in the legislative history of the Fed-

The analysis is complicated when blurring is applied to "similar," or indeed, the same products. I have already determined that there has been an insufficient showing made regarding the likelihood of confusion as to the source or association of the two products. Thus, plaintiffs must argue that when someone deliberately purchases a Falling Water faucet because it looks like a VOLA, knowing full well the distinction, their product's identification has been blurred.[31] To succeed on its dilution by blurring claim, Lund must demonstrate that "the use of a junior mark has caused a lessening of demand for the product or services bearing the famous mark ...." *Ringling Bros.*, 955 F.Supp. at 616.

### 3. Blurring Factors

■ Judge Sweet, concurring in *Mead Data*, set forth the following factors which courts have been used to determine whether there is blurring under state law anti-dilution statutes: ·

1) similarity of the marks;

2) similarity of the products covered by the marks;

3) sophistication of consumers;

4) predatory intent;

5) renown of the senior mark;

6) renown of the junior mark.

*Mead Data*, 875 F.2d at 1035 (Sweet, J., concurring). These factors have been adopted by courts in assessing dilution by blurring under the Federal Dilution Act. *Ringling Bros.*, 955 F.Supp. at 618; *Clinique*, 945 F.Supp. at 562.[32] Since I have already covered the first two factors in analyzing the likelihood of confusion, I turn to the final four factors: the sophistication of potential consumers, predatory intent, the renown of the senior and junior marks.

The sophistication of potential consumers cuts in favor of a finding of blurring. Knowledgeable customers may well understand, as testimony suggests, that the Falling Water is easier to find and less expensive to purchase. Such purchasers may buy the Falling Water, knowing they are not getting a VOLA, but knowing, too, that they are getting a product of similar quality, albeit one that has not been featured in MoMA, for less money, with lower search costs.

Predatory intent also weighs in favor of a finding of a likelihood of blurring. "The likelihood of blurring is increased where a junior mark is used in the hopes of benefitting from its similarity to a famous mark." *Ringling Bros.*, 955 F.Supp. at 620. While Slothower and Kohler may not have tried to copy the VOLA exactly, there was no question, according to the evidence, that Kohler would benefit from the similarities between the two products. In fact, Kohler admitted in its November 22, 1994, letter to Lund, that it was "interested in the possible purchase of this product and potentially others that you may have in your offering *for resale under our brand name in the United states.*" (emphasis added) Use of the VOLA in advertisements for Robern's sinks, after Robern stopped selling the VOLA faucet (having replaced it with the Falling Water), further suggests that Robern's message to consumers may well have been that the Falling Water is just as good as the VOLA they used to sell.

Lastly, in the world of interior design and high-end bathroom fixtures, the VOLA is renowned. While the Falling Water may not yet be renowned, it is manufactured and distributed by the largest plumbing supplies manufacturer in the United States. It has been advertised since its introduction; distribution channels behind it seem strong, and it

eral Dilution Act. H.R.Rep. No. 104–374, 104th Cong., 1st Sess., at 3 (1995).

**31.** As discussed above, the approach—as applied to a product design of a competitor—raises concerns. The VOLA is famous, and its distinctive qualities may be lessened because its market may now be flooded by a competitor with enormous market power. The VOLA could have been protectable by a design patent of limited duration. Here, if Lund ultimately succeeds, the law enti-

tles Lund to patent-like protection against competitors copying the VOLA's design, even where there is insufficient likelihood of confusion.

**32.** The *Clinique* court did not include "predatory intent" as a factor. 945 F.Supp. at 562 n. 22. The *Ringling Bros.* court, however, explains rather persuasively why predatory intent should continue to be a relevant factor. 955 F.Supp. at 620 n. 28.

is likely to achieve some degree of renown in its market, if it has not already, in a relatively short time. These factors therefore weigh in favor of finding a likelihood of blurring.

On this record, plaintiffs have shown a likelihood of success on their claims that the Falling Water may eventually evaporate some of Lund's capacity to distinguish its faucets from Kohler's, and will likely dilute the VOLA's brand identity.

## IV. CONCLUSION

The plaintiffs' motion for a preliminary injunction based on their claims of trademark infringement under 15 U.S.C. § 1125(a) is **DENIED,** as they have not met their burden of showing a likelihood of confusion. Lund's motion for a preliminary injunction based on trade dress dilution under 15 U.S.C. § 1125(c) is **GRANTED,** as the VOLA is a famous mark, whose capacity to identify and distinguish VOLA faucets is likely to be lessened by defendants' use of the Falling Water faucet. The constitutional question of whether the Dilution Act unlawfully extends patent protection is **RESERVED.**

A status conference will be held on February 11, 1998, at 2:00 p.m., at which point a briefing schedule will be entered to address the constitutional issues raised by defendants.

**SO ORDERED.**