**I.P. LUND TRADING ApS and Kroin Inc., Plaintiffs,**

v.

**KOHLER CO. and Robern, Inc., Defendants.**

**No. CIV. A. 97–10427–NG.**

United States District Court, D. Massachusetts.

Oct. 6, 2000.

Cornelius J. Moynihan, Jr., Steven N. Fuller, David H Gibbs, Jason C. Kravitz, Nixon Peabody, Allison E. Picott, Jason Kravitz, Nixon Peabody, Boston, MA, for Plaintiffs.

Hugh Latimer, Karyn Ablin, Wiley, Rein & Fielding, Washington, DC, Stephen H. Lash, Jager, Smith, Stetler & Arata, Boston, MA, for Defendants.

### MEMORANDUM AND ORDER

GERTNER, District Judge.

## I. INTRODUCTION

This case goes to the heart of the question: What is the scope of trade dress

protection that a product design may be afforded under the Lanham Act?[1] I.P. Lund Trading ApS ("Lund") and Kroin Incorporated ("Kroin") seek protection for what courts often call a "product configuration," here a bathroom faucet known as the VOLA ("VOLA").[2] The VOLA was designed by a Danish inventor nearly thirty years ago. Lund has owned and marketed the product since its inception. Kroin is its exclusive distributor in the United States.

Defendant Kohler Company ("Kohler") designed a similar product called the Falling Water faucet ("Falling Water I"). Kohler and its subsidiary, Robern, Inc. ("Robern"), started selling the Falling Water I in February 1996.[3]

Lund initiated this action by seeking permanent injunctive relief and monetary damages against Kohler for: (1) infringement of its distinctive trade dress and unfair competition under 15 U.S.C. § 1125(a); (2) dilution of its famous trade dress under 15 U.S.C. § 1125(c); (3) dilution of trade dress under various state anti-dilution statutes; and, (4) unfair and deceptive trade practices under several state statutes. In a nutshell, Lund is seeking indefinite protection of its unpat-ented faucet design against copying and reproduction by its competitors.

Discovery is complete. Kohler moves for summary judgment on a multitude of grounds. Kohler's first motion for summary judgment argues that Lund has failed to produce evidence from which a jury could find that the VOLA design acquired "secondary meaning," and therefore, the design is not protectable as trade dress. In addition, Kohler filed three other motions for summary judgment based on: (1) the alleged functionality of the VOLA design, which Kohler argues, requires Lund to seek protection in a design patent, for a limited term, rather than trademark protection; (2) Lund's alleged failure to establish dilution of its design; and, (3) Lund's alleged failure to establish infringement and unfair competition under state law. The parties presented voluminous materials to the Court in support of their positions on summary judgment. On July 19, 2000, a hearing was held.

Having considered the entire record before me, I now conclude that there exists no genuine issue of material fact as to whether the VOLA has acquired secondary meaning; it has not. Thus, three of Koh-

---

1. Section 43(a) of the Lanham Act provides: (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
   (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person ... shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.
   15 U.S.C. § 1125(a). The Federal Trademark Dilution Act ("FTDA"), set forth in Section 43(c) of the Lanham Act, provides remedies for dilution of famous marks:
   (1) The owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark, and to obtain such other relief as is provided in this subsection.
   15 U.S.C. § 1125(c). The terms of the Lanham Act are defined in section 45. See 15 U.S.C. § 1127.

2. The claims here actually involve the design of three single-control, wall-mounted lavatory faucet models which differ only in spout length. The faucets' model numbers are 111C, 121C, and 121CNOST. For convenience, the Court will refer to the faucets collectively as "the VOLA faucet" or the "111C faucet."

3. Throughout this opinion, I treat plaintiffs collectively as "Lund" and defendants collectively as "Kohler."

ler's motions for summary judgment, which hinge on that finding (for failure to establish secondary meaning, infringement, and dilution [docket ## 239, 241, and 243]) are **GRANTED** as to Counts I–VIII of Lund's Amended and Supplemental Complaint. As to Counts IX–XIII, the parties failed to adequately brief Lund's non-trademark theories of liability brought under state unfair and deceptive trade practices statutes. The parties have until **November 2, 2000,** to file supplementary briefs on those claims. Kohler's Motion for Summary Judgment of Functionality [docket # 237] is **DENIED.** Lund's Motion to Exclude Testimony by Defendants' "Expert" Witnesses [docket # 230] and Motion to Compel [docket # 275] are **MOOT.**

## II. *BACKGROUND*

### A. *Factual Context*

Lund is a family-owned Danish corporation, established in 1873. It manufactures high-end kitchen and bathroom faucets, fixtures, and accessories. The VOLA faucet was designed by the distinguished architect Professor Arne Jacobsen ("Jacobsen") in 1968. It has won numerous design awards, including the Danish ID prize for industrial design innovation, and the Danish Classic ID prize (awarded to products whose designs have survived and thrived for twenty-five years without significant design modification).

The VOLA faucet design has remained virtually unchanged throughout the past thirty years. Since 1969, the year the VOLA products were introduced, Lund has sold more than 600,000 VOLA faucets throughout the world. The VOLA line of sanitary fittings is Lund's principal source of revenue.

Co-plaintiff Kroin is the sole American distributor of the VOLA. Kroin's owner, Larry Kroin, was Lund's first American distributor, starting in 1976. Kroin has since sold thousands of VOLA faucets, amounting to approximately $16 million worth of sales. Between 1988 and 1997, Kroin spent more than $684,000 to advertise the VOLA line of sanitary fittings.[4]

Lund has promoted the VOLA faucet across the world, spending more than $10 million since 1980. Most of the advertisements for the VOLA are print advertisements that appear in prestigious design magazines, including *Architectural Record, Interior Design,* and *Interiors.* Hundreds of pictures of the VOLA have appeared as parts of photo spreads in these magazines, and other less specialized magazines, such as *Better Homes and Gardens.*

Kohler, based in Kohler, Wisconsin, is the largest plumbing fixtures supplier in the United States, with more than $1.5 billion worth of sales in 1996 alone. Kohler sells hundreds of different kitchen and bathroom sanitary fitting designs. On November 22, 1994, Kohler's Purchasing Manager, Jeffrey Klosterman, contacted Lund expressing Kohler's "interest[ ] in the possible purchase of this product [the VOLA] and potentially others that you may have . . . for resale under our brand name in the United States." The letter also requested volume pricing and several product samples for testing "under United States regulations."

In January 1995, Kohler purchased from Lund eight VOLA 121C faucets "to begin qualification testing." According to Kohler, the company intended to introduce (in September 1995) their new "Vessels" basin, a "high-end sink with no holes (as compared to the normal three-hole sink)."[5] The company sought an accompanying faucet for its product. While the VOLA was compatible with the Vessels sink, Kohler claims that an April 1995 test report showed that the VOLA faucets did not comply with federal and state legal "requirements." Specifically, Kohler alleges

---

4. This figure includes advertising for fittings other than the 111C faucet.

5. The three holes in the "normal" sink are for the hot and cold spigots, and the water spout.

that the VOLA did not meet requirements concerning water flow capacity and resistance to hydrostatic pressure.[6] Lund disputes these findings, as well as the significance of any such federal, state, or local "requirements."

Robern, before it became a Kohler subsidiary, designed a bathroom sink module which was compatible with the VOLA, known as the MTS Sink Module. Robern sold these modules with VOLA faucets purchased from Kroin. Between January 1993 and September 1995, Robern purchased 218 VOLA faucets directly from Kroin.

In August 1995, Kroin accused Robern of selling VOLA faucets to Kroin customers for prices lower than what Kroin was charging. Kroin then refused to sell Robern any more VOLA faucets. Shortly thereafter, Kohler acquired Robern. In August 1996, Robern announced that it would ship MTS Sink Modules with Kohler's Falling Water I faucets, which are also compatible with no-hole, freestanding vessel sinks. After Robern ceased sales of VOLA faucets, however, Robern distributed at least one sales brochure depicting the VOLA faucet alongside the Falling Water I and other lavatory accessories.

The Falling Water I faucet was designed by Erich Slothower, a Kohler industrial designer. He testified (at an earlier hearing on preliminary injunctive relief) that while he was aware of the VOLA, and even looked at it carefully before designing the Falling Water I, he consciously tried to make his faucet different in appearance than the VOLA. However, the Falling Water I shares several features of the VOLA design. Similarities between the two faucets include: (1) both are single-control, wall-mounted faucets; (2) both control handles utilize a thin cylindrical lever to adjust water temperature and volume; (3) both faucets' spouts and aerator holders are of uniform diameter; (4) both spouts bend downward at right angles softened by a curve; and, (5) both faucets offer spouts in almost exactly the same three lengths.

There are also differences. First, the Falling Water I has a tapered and rounded bonnet on the handle, and when the lever on the bonnet is operated to control the water temperature and volume, the entire bonnet moves with it. By contrast, the VOLA handle is shorter; it is a completely uniform cylinder, not tapered; and only the lever moves to control volume, while the lever and cylinder turn clockwise or counter-clockwise to control temperature. Second, the Falling Water I's lever is rounded on the top, while the VOLA's lever is flat. Third, the mounting end of the Falling Water I spout also has a tapered, rounded bonnet, mirroring that of the handle and lever, while the VOLA spout has no bonnet.

After this lawsuit was initiated by Lund, Kohler introduced a re-designed Falling Water faucet ("Falling Water II") in June 1998. Lund concedes that the re-designed Falling Water II does not infringe its VOLA faucet design. The Falling Water II now significantly outsells both the Falling Water I and the VOLA in the United States.

Lund claims the sale of the Falling Water I faucet, and its advertisement in catalogues which also depict the VOLA faucet (indeed, side-by-side), causes confusion among retailers and customers, and dilutes the brand-identity of the VOLA faucet, all in violation of 15 U.S.C. §§ 1125(a) and (c). Kohler argues inter alia, that the VOLA faucet design is not entitled to trademark protection under 15 U.S.C. §§ 1125(a) and (c) because it is not "distinctive" within the meaning of that statute.

To succeed on its claims, Lund must squeeze the facts of its case within the murky and shifting boundaries of current trademark law.

---

**6.** Kohler alleges that the VOLA flow rate of eighty pounds per square inch of water pressure is too high for both federal and state standards.

## B. *Legal Context*

On Lund's application for preliminary injunctive relief, I found that it was not likely to succeed on its claim of trade dress infringement because its customers—sophisticated purchasers of high end faucets—were not likely to confuse a VOLA faucet with a Kohler faucet. *See I.P. Lund Trading ApS v. Kohler Co.*, 11 F.Supp.2d 112, 115 (D.Mass.1998) [hereinafter "*Lund I* "], aff'd in part, vacated in part, 163 F.3d 27 (1st Cir.1998). However, Lund's dilution claims raised more fundamental problems. *Id.* at 117–19. Lund was (and still is) seeking 1) protection for a product design, 2) under a theory that is more diffuse than traditional infringement theory, namely that the trade dress has been "diluted" by its use in connection with the product of a competitor, and, 3) for an unlimited period of time. The Constitution's Patent Clause, after all, specifies protection of product designs for "limited Times" only. U.S. Const. art. I, § 8, cl. 8. Nevertheless, the issue was one of first impression. The dilution statute was relatively new, and the limited case law was favorable to Lund's position. I therefore concluded that a preliminary injunction should issue on the dilution claim.[7]

On appeal, the First Circuit affirmed the infringement finding but vacated the dilution finding. *I.P. Lund Trading ApS v. Kohler Co.*, 163 F.3d 27, 51 (1st Cir.1998) [hereinafter "*Lund II* "]. In so doing, the court began the process of clarifying many of the issues raised in *Lund I*—concerns about using infringement and dilution concepts to create protections for product designs otherwise unavailable under patent law. *See Lund II*, 163 F.3d at 32–33. Other courts have followed suit. Although the law continues to permit trade dress protection for product configurations under certain circumstances, those circumstances are more limited today than they appeared to be when this case was filed. *See Wal–Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 120 S.Ct. 1339, 1344–46, 146 L.Ed.2d 182 (2000) [hereinafter "*Samara Bros.*"]; *Yankee Candle Co. v. Bridgewater Candle Co.*, 99 F.Supp.2d 140, 152–54 (D.Mass.2000) [hereinafter "*Yankee Candle* "].

While the Court will not repeat its discussion in *Lund I*, it is useful to briefly revisit the broader contours of trademark law before addressing the most recent changes in the law as they affect Lund's action.

### 1. *The Trademark Landscape*

The paradigm for a trademark was a two-dimensional symbol (word, name, device or combination thereof) adopted and used by a merchant to identify her goods and distinguish them from articles produced by others. And the paradigm of trademark protection, via a suit for infringement, was to prevent the use of the same or similar marks by competitors in a way that confused the public about the actual source of the goods or service.[8]

---

7. I noted:

> On this truncated record, I am obliged to agree with the plaintiffs. The case law describes trade dress protection broadly ... The sole court to have addressed the question of whether the dilution statute applies to a product's design and configuration has extended the Act's trade dress protection. *Sunbeam Products, Inc. v. West Bend Co.*, 1996 WL 511639, at *13 (S.D.Miss. May 3, 1996), aff'd, 123 F.3d 246, 261 (1997) (finding "Mixmaster" blender's design as a whole to be protected against trade dress dilution). While there may be constitutional questions about such protection as ap-
>
> plied to the facts of the case at bar, those concerns must wait for another day.
>
> *Lund I*, 11 F.Supp.2d at 119.

8. Trademark infringement suits focus on the acts of competitors diverting sales by "passing off" one competitor's goods as those of another, thereby confusing the public as to the source of the product. The threshold question for a non-registered mark is whether, in trademark parlance, it is "distinctive." A mark is considered distinctive when it represents a feature by which consumers "identify and distinguish" the producer's goods "from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." 15 U.S.C.

*Lund II,* 163 F.3d at 36. Thus, traditional trademark law "encourages production of products of high quality 'and simultaneously discourages those who hope to sell inferior products by capitalizing on a consumer's inability quickly to evaluate the quality of an item offered for sale.'" *Id.* (citing *Qualitex Co. v. Jacobson Products Co.,* 514 U.S. 159, 164, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995)).

Over time, courts extended trademark protection to cover not only words or symbols identifying products but also "trade dress"—a three dimensional product design or packaging.[9] *See Two Pesos,* 505 U.S. at 773–74, 112 S.Ct. 2753 (product packaging in decor of restaurant); *Chrysler Corp. v. Silva,* 118 F.3d 56, 58 (1st Cir.1997) (automobile design). Companies successfully claimed trademark rights in a variety of product configurations over the last fifteen years.[10] *E.g., Two Pesos,* 505 U.S. at 770, 112 S.Ct. 2753; *Sunbeam Prods., Inc. v. West Bend Co.,* 123 F.3d 246, 252–57 (5th Cir.1997) (shape of a mixer); *Kohler Co. v. Moen Inc.,* 12 F.3d 632, 643–44 (7th Cir.1993) (configuration of a faucet and faucet handle) [hereinafter *"Kohler"*]. Indeed, many courts, including the First Circuit, eschewed any distinctions between trademarks and trade dress. *See Two Pesos,* 505 U.S. at 773–74, 112 S.Ct. 2753; *Chrysler,* 118 F.3d at 58; *Kohler,* 12 F.3d at 643–44.

But the application of traditional trademark principles to product configurations raises unique problems which do not arise in word mark or product packaging cases.[11] Namely, trade dress protection of product designs brings the Lanham Act into potential conflict with federal patent law by offering the possibility of indefinite protection of product designs from use by competitors, rather than the "limited Time[ ]" protection of the Patent Clause. Nevertheless, while several courts reiterated these concerns, none invalidated the extension of trade dress protection to a product's design on those grounds. *But see Lund II,* 163 F.3d at 38 (functionality doctrine prevents a constitutional conflict between the Lanham Act and patent law); *Kohler,* 12 F.3d at 643 ("It is apparent, however, that perpetual trademark protection under the Lanham Act for a product configuration or design is not the equivalent of impermissible perpetual patent protection."); *Esercizio v. Roberts,* 944 F.2d 1235, 1246 (6th Cir.1991) (affirming trade dress protection of nonfunctional automobile designs that were "primarily adopted for purposes of identification and individuality") [hereinafter *"Esercizio"*].

Apart from constitutional concerns, commentators also raised other questions about the protection of product configurations as trade dress.[12] With word marks and product packaging, it is rather obvious that these symbols do not describe the product with which they are identified; those marks clearly serve source-identification purposes. *See* Gleiberman, *supra,*

§ 1027. When such a mark is either "inherently distinctive" or it acquires distinctiveness, i.e., acquires "secondary meaning" in the minds of the relevant public, trademark protection is triggered. *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 769, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992) [hereinafter *"Two Pesos"*].

9. For a fuller discussion of this evolution, see Mark A. Lemley, *The Modern Lanham Act and the Death of Common Sense,* 108 Yale L.J. 1687, 1697–1701 (1999); Melissa R. Gleiberman, Note, *From Fast Cars to Fast Food: Overbroad Protection of Product Trade Dress Under Section 43(a) of the Lanham Act,* 45 Stan. L.Rev.2037, 2039–55 (1993).

10. Some plaintiffs even succeeded in protecting the features of their products for which they had previously received a patent. *E.g., Thomas & Betts Corp. v. Panduit Corp.,* 138 F.3d 277, 283 (7th Cir.1998) (concluding that product configuration could be protected even though the overall product was patented).

11. *See* David S. Welkowitz, *Trade Dress and Patent—The Dilemma of Confusion,* 30 Rutgers L.J. 289, 299–300, 306–08 (1999); Gleiberman, *supra,* at 2040, 2055–61.

12. *See* Lemley, *supra,* at 1697–98, 1704–05; Gleiberman, *supra,* at 2043–44, 2066.

at 2042–43. On the other hand, product designs are not intended to identify the producer. Indeed, they do not serve that purpose in most instances. *See* Lemley, *supra*, at 1704; Gleiberman, *supra*, at 2042–43. For the most part, unique product features increase the utilitarian or aesthetic value of the product for the consumer—a goal that is not advanced by trademark law.

Finally, the application of a dilution theory to Lund's product, in addition to infringement theory, exacerbates all of these concerns. Dilution protection is not only unlimited in time; it does not require proof of consumer confusion as do infringement theories. The FTDA permits the owner of a "famous" mark to obtain injunctive relief against uses of its mark which either tarnish or blur its distinctiveness.[13] Concerned about the breadth of the statute, one commentator suggested that the clear intention of the statute "seems to have been to restrict dilution doctrine to a relatively small class of nationally known trademarks whose fame is sufficiently great that the risk of blurring by multiple noncompeting uses is significant." Lemley, *supra*, at 1698. But, at least in the years immediately following its passage, some courts imposed no such limitations. *E.g., Nailtiques Cosmetic Corp. v. Salon Sciences Corp.*, 41 U.S.P.Q.2d 1995, 1998–99 (S.D.Fla.1997) (holding "Nailtiques" famous for fingernail care products and diluted by "Pro–Techniques"); *WAWA, Inc. v. Haaf*, 40 U.S.P.Q.2d 1629, 1631 (E.D.Pa. 1996) (holding "Wawa" famous for convenience stores in Pennsylvania and surrounding states).

### 2. *Recent Developments*

The Supreme Court, the First Circuit, and other federal courts have clarified a number of the legal standards applicable here, ultimately to Lund's detriment.

In *Lund II*, the Court noted that trade dress infringement and dilution share three elements:

> Despite different purposes being served, claims for protection against trademark and trade dress infringement, on the one hand, and dilution, on the other, share three common elements before the analyses diverge. Those elements are that marks (a) must be used in commerce, (b) must be non-functional, and (c) must be distinctive. While all such marks may be protected against infringement, under the FTDA only famous and distinctive marks are eligible for protection against dilution. No requirement for fame is present in trademark and trade dress infringement.

*Lund II*, 163 F.3d at 36. Raising concerns about the unique problems of product design protection, the court then outlined three principles.

First, it is only appropriate to seek trade dress protection for a product design, rather than the more limited patent protection, when the design is non-functional. Moreover, the burden of proving non-functionality of a product for which trade dress protection is sought rests squarely on the shoulders of the party seeking that protection. *Id.* at 37.

---

**13.** The original Lanham Act did not cover the actions of non-competitors appropriating a famous mark. *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1075 n. 6 (5th Cir.1997) (noting that "a federal cause of action for trademark dilution was apparently not available until the Lanham Act was amended to include one in 1996"). Such actions would obviously not deceive or confuse customers purchasing the goods designated by famous marks; typically, different products were involved. Nevertheless, the appropriation of a well-known mark could give a non-competitor an unfair and unearned advantage in the marketplace. As a result, the initial mark would be "diluted," or disassociated from the product in connection with which it had been used. Traditionally, dilution analysis would, as the Act's legislative history makes clear, involve a trademark being used for a different product, for example, Buick aspirin or Kodak pianos. H.R.Rep. No. 104–374, 104th Cong., 1st Sess. (1995), at 3 (citing "DUPONT shoes, BUICK aspirin, and KODAK pianos" as examples of potential dilution).

■ Second, given the fact that product designs are usually intended for aesthetic or utilitarian, not source identifying, purposes, the First. Circuit clarified the distinctiveness test. Lund must show "that something in the design which is not functional serves primarily to signify the source of the faucet and not primarily to signify that it is an aesthetically pleasing faucet." *Id.* at 42. The court rejected the argument that this "primary significance" test is "too stringent." *Id.* "Where the protection of the product design itself is at issue, there is every reason to hold to the usual stringent primary significance test in order to minimize constitutional concerns." *Id.*

■ The Supreme Court went one step further. While a traditional unregistered trademark is protected from infringement where a plaintiff shows that the mark is inherently distinctive, *or* that it acquired secondary meaning, the Court held that trade dress protection of a product design is available "only upon a showing of secondary meaning." *Samara Bros.*, 120 S.Ct. at 1346. Its reasoning mirrored that of the First Circuit. The predominant function of word marks and product packaging is to identify the source of a product. *Id.* at 1344. In contrast, "consumer predisposition to equate [product features] with the source does not exist." *Id.* Rather, the Court emphasized that "[c]onsumers are aware of the reality that, almost invariably, even the most unusual of product designs—such as a cocktail shaker shaped like a penguin—is intended not to identify the source, but to render the product itself more useful or more appealing." *Id.* Indeed, it suggests courts should exercise caution in finding a product configuration primarily serves as a source-identifier.

■ Finally, the dilution theory has been limited as well. The First Circuit held that a party seeking to establish "fame" of the trade dress for protection against dilution "bears a significantly greater burden than the burden of establishing distinctiveness for infringement purposes." *Lund II*, 163 F.3d at 33.

Lund, in short, faces an uphill battle. It must prove its VOLA faucet design is not functional, that it falls outside that class of products which consumers view as primarily useful or aesthetically pleasing, and that it is famous within the meaning of the law. If Lund fails to meet either the functionality or distinctiveness standard, the law affords Lund no protection even from competitors' direct copying and resale of the VOLA design under a different label. The Seventh Circuit expressed a particularly apt sentiment over sixty years ago:

> The law of unfair competition stresses business integrity, encourages legitimate trading, and protects good will against spoliation. However, it is not true that all acts done in the trade, which the average person would describe as unfair, are actionable. 'As a manufacturer, one has a perfect right to make any article of commerce not covered by a patent monopoly .... As a distributor, however, he must respect those methods of honest and upright dealing which forbid one competitor from adapting practices which are now well understood to be unfair or fraudulent.'

*Sinko v. Snow–Craggs Corp.*, 105 F.2d 450, 452 (7th Cir.1939) (citing *William H. Keller Inc. v. Chicago Pneumatic Tool Co.*, 298 F. 52, 57 (7th Cir.1923)).

As discussed below, this case never crosses the line from what the ordinary person would regard as unfair to unfairness under the Lanham Act. Lund cannot prove its product configuration has acquired secondary meaning within the meaning of the law. It is likewise unable to establish that its configuration has become "famous." And given these holdings, I need not reach the substantive dilution analysis.

## III. ·DISCUSSION

The record shows that Lund produces an aesthetically pleasing faucet, which acquired some renown among members of

the interior design trade. Quite clearly, this renown derives from the fact that Lund was the sole producer of single-control, wall-mounted faucets in the United States for twenty years. When competitors joined the wall-mounted faucet market, Lund was helpless to prevent their entry. It had not obtained a design patent on its faucet, and even if it had, the patent would have expired before 1996.

Moreover, Lund cannot now claim trademark protection for certain aspects of its design, namely, the wall-mounted, single-control elements. Those elements are functional. Even if their characteristics served as a brand-identifier for Lund after years of exclusive use, trademark protection of those functional elements would unduly interfere with legitimate competition in the faucet market. Lund has presented evidence, however, that would support a finding that other aspects of its product configuration are non-functional.

Nevertheless, even if these aspects of the VOLA are non-functional, Lund's evidence, when taken in the light most favorable to it, fails to show that the VOLA design serves as a brand identifier. After years of touting the product's beauty, winning awards for it, seeing the product in museums and architecture magazines, it is clear that the "primary significance" of the design is aesthetic.

None of Lund's consumer surveys suggest otherwise. They prove that the design signifies Lund to some consumers, while identifying Kohler and other manufacturers to others. Indeed, the evidence suggests that if consumers purchase the product because of its source, they do so because of the word mark "VOLA"—not because of the design. For these reasons, Kohler is entitled to judgment as a matter of law on Counts I–VIII.

### A. *Summary Judgment Standard*

Summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "A factual dispute is material if it 'affects the outcome of the litigation,' and genuine if manifested by 'substantial' evidence 'going beyond the allegations of the complaint.'" *Pignons S.A. de Mecanique de Precision, v. Polaroid Corp.*, 657 F.2d 482, 486 (1st Cir.1981) (citing *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975)). In ruling on a summary judgment motion, the Court "must view the record and draw inferences most favorably to the opposing party." *Id.*

Thus, Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the non-moving party bears the burden of proof on some issue at trial, the moving party need not produce evidence undermining the non-moving party's case. Instead, the moving party may simply point out to the district court the absence of evidence to support the non-moving party's case. *Id.* at 325, 106 S.Ct. 2548. The question then "'is not whether there is literally no evidence'" favoring Lund, but "'whether there is any upon which a jury could properly proceed to find a verdict'" in Lund's favor. *Caputo v. Boston Edison Co.*, 924 F.2d 11, 13 (1st Cir.1991) (citing *De Arteaga v. Pall Ultrafine Filtration Corp.*, 862 F.2d 940, 941 (1st Cir.1988)).

### B. *Common Elements of Infringement and Dilution Claims*

As discussed above, *Lund II* set forth the three shared elements of all trade dress infringement and dilution claims: Marks must be (1) used in commerce, (2) non-functional, and (3) distinctive. *Lund*

*II*, 163 F.3d at 36. The first element—use in commerce—is plainly satisfied in this case. It is the latter two elements that require discussion.

## C. *Functionality*

### 1. *Legal Standard*

"To be protected under the Lanham Act, a trademark or trade dress must not be functional." *Id.* The functionality doctrine marks the boundaries of trade dress protection from patent law. It " 'prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature.' " *Id.* (citing *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 164, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995)). "The rule against functional features being protected as symbols of origin 'is to prevent the grant of perpetual monopoly by the issuance of a trade-mark in the situation where a patent has either expired, or . . . cannot be granted.' " *Id.* at 37 (citing *Sylvania Elec. Prods., Inc. v. Dura Elec. Lamp Co.*, 247 F.2d 730, 732 (3d Cir.1957)).

To determine whether a product configuration is functional or non-functional, the Court must inquire into the effects that granting protection to a product will have on competition. A product feature is functional "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article, that is, if exclusive use of the feature would put competitors at a significant non-reputational-related disadvantage." *Qualitex*, 514 U.S. at 165, 115 S.Ct. 1300. The inquiry also turns in part "on whether granting protection to a mark would permit one competitor . . . to interfere with legitimate (nontrademark-related) competition through actual or potential exclusive use of an important product ingredient.' " *Lund II*, 163 F.3d at 37 (citing *Qualitex*, 514 U.S. at 170, 115 S.Ct. 1300).

A product that contains some functional elements is not necessarily excluded from trade dress protection. Instead, an " 'arbitrary combination of functional features, the combination of which is not itself functional, properly enjoys protection.' " *Id.* (citing *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1119 (5th Cir. 1991)). Lund has the burden of proving non-functionality of those elements of the VOLA design that Lund claims constitute the "mark" and for which Lund is seeking protection. *Id.*

### 2. *Application of the Functionality Doctrine to the VOLA Faucet Design*

Kohler argues that: (1) Lund intended the VOLA to be an essentially functional design; (2) Lund touted its product as functional; and (3) Lund achieved its goal of functionality in its design such that protection of that design would unduly restrict competition in the single-control, wall-mounted faucet market. Lund responds that its advertising promotions are irrelevant and that the existence of "a multitude of shapes that can be used in the design of a single control, wall-mounted faucet" creates a genuine issue of material fact as to functionality. Plaintiffs' Opposition to Defendants' Four Motions for Summary Judgment at 9 [hereinafter "Lund Opp."].

■ As an initial matter, the Court notes that at least some elements of the VOLA faucet are functional. *Cf. Lund II*, 163 F.3d at 38. For example, the wall-mounted and single-control characteristics, which are the most unusual aspects of the design, are purely functional elements that cannot be protected taken alone. If Lund were seeking protection simply of these elements, competition in the wall-mounted faucet market would be unduly restricted.

However, the Court also finds that the shapes, sizes, proportions, and ornamentations of the VOLA's design, while minimalist in nature, are not simply functional elements considered in combination. There exists evidence in the record from

which a jury could find that there are many other wall-mounted faucet designs available to competitors. *See, e.g.*, Appendix to Defendants' Summary Judgment Motions, Exhibit 49 [hereinafter "Kohler App., Exh."]. In effect, the other designs are non-functional variations on the same theme.

Protecting Lund's design as trade dress would not unduly restrict competition. *See Kohler*, 12 F.3d at 643; *Big Top USA, Inc. v. The Wittern Group*, 998 F.Supp. 30, 43–44 (D.Mass.1998). Indeed, Kohler's own Falling Water II faucet outsells both the Falling Water I and the VOLA faucets. Competing faucets are also sold at a price substantially lower than that charged for the VOLA. Accordingly, on the basis of the record before the Court, Kohler's Motion for Summary Judgment of Functionality must be denied.

Nevertheless, even assuming a jury could find the VOLA design non-functional, the Court finds that Lund has failed to establish that the design acquired secondary meaning.

#### D. *Secondary Meaning*

■ Whether a product design or mark has acquired secondary meaning is a question of fact. *Boston Beer Co. v. Slesar Bros. Brewing Co.*, 9 F.3d 175, 180 (1st Cir.1993) [hereinafter "*Boston Beer*"]. The inquiry into distinctiveness turns on "the total appearance of the product, not on individual elements." *Lund II*, 163 F.3d at 39. Applying the stringent "primary significance" test to the facts of this case, the Court finds that Lund has failed to meet its burden as to secondary meaning.

#### 1. *Legal Standard*

In *Samara Brothers*, the Supreme Court held that trade dress in the form of a product's design (as opposed to packaging) can never be inherently distinctive.[14] *See* 120 S.Ct. at 1346. Thus, Lund's VOLA design is distinctive, and therefore protectable, only upon a showing of secondary meaning.[15] Secondary meaning occurs when, "in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982).

In *Kellogg Co. v. National Biscuit Co.*, the Supreme Court first set out the definition of secondary meaning applicable in product configuration cases. *See* 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73 (1938) [hereinafter "*Kellogg*"]. National Biscuit Co. ("Nabisco") brought suit against Kellogg to enjoin alleged unfair competition by the manufacture and sale of the breakfast food commonly known as "shredded wheat." *Id.* at 111, 59 S.Ct. 109. For more than ten years after the expiration of the patent on the shredded wheat form (and the machines responsible for making that form), Nabisco was the exclusive manufacturer of shredded wheat. As a result of that exclusive use, Nabisco claimed an exclusive

---

**14.** Typically, a trademark can be found to be distinctive in one of two ways. First, a mark is inherently distinctive if " '[its] intrinsic nature serves to identify a particular source.' " *Samara Bros.*, 120 S.Ct. at 1343 (citation omitted). Second, a mark may acquire distinctiveness even if it is not inherently distinctive. *Id.* The *Samara Brothers* decision eliminated the former as a test for distinctiveness in product design cases.

**15.** The Supreme Court explained the origin of the phrase "secondary meaning":

The phrase "secondary meaning" originally arose in the context of word marks, where it served to distinguish the source-identifying meaning from the ordinary, or "primary," meaning of the word. "Secondary meaning" has since come to refer to the acquired, source-identifying meaning of a non-word mark as well. It is often a misnomer in that context, since non-word marks ordinarily have no "primary" meaning. Clarity might well be served by using the term "acquired meaning" in both the word-mark and the non-word-mark contexts—but in this opinion we follow what has become the conventional terminology. 120 S.Ct. at 1343 n*.

right to the trade name "Shredded Wheat" and the exclusive right to make shredded wheat biscuits pillow-shaped. Nabisco charged Kellogg with "passing off" its goods for those of Nabisco by using the name and shape of Nabisco's biscuits. *Id.* at 112, 59 S.Ct. 109. Kellogg clearly packaged its product under its own label and trade name.

The Supreme Court held that Nabisco had no right to exclusive use of the term "Shredded Wheat" as a trade name as that term "is the generic term of the article, which describes it with a fair degree of accuracy." *Id.* at 112–13, 59 S.Ct. 109. While over time, and particularly during the time when Nabisco had a monopoly, many people associated the name by which the product was known with Nabisco's factory at Niagara Falls, that meaning was not the primary significance of the term. Rather, Nabisco was obliged to show "that the primary significance of the term in the minds of the consuming· public is not the product but the producer." *Id.* at 118, 59 S.Ct. 109. This, the Court found, Nabisco had not done, despite spending $17 million in making the name a household word and identifying the product with its manufacture.

Similarly, the *Kellogg* Court made hash out of Nabisco's trade dress claim under the same standard. The Court emphasized:

[A] particular manufacturer can no more assert exclusive rights in a form in which the public has become accustomed to see the article and which, in the minds of the public, is primarily associated with the article rather than a particular producer, than it can in the case

of a name with similar connections in the public mind.

*Kellogg,* 305 U.S. at 120, 59 S.Ct. 109. Trademark law and fairness dictated only that Kellogg market the pillow-shaped biscuit "in a manner which reasonably distinguishes its product from that of plaintiff." *Id.*

While *Lund* never secured a patent for the VOLA faucet in this case, the facts and analysis required here track the *Kellogg* case. The central inquiry before this Court is whether, in the minds of the relevant consumers, the primary significance of the VOLA design is to identify the source of the product, Kroin, rather than the product itself.[16] *See Samara Bros.,* 120 S.Ct. at 1343; *Kellogg,* 305 U.S. at 120, 59 S.Ct. 109; *Lund II,* 163 F.3d at 41–42. Stated another way: "[S]omething in the [VOLA] design which is not functional" must serve "primarily to signify the source of the faucet and not primarily to signify that it is an aesthetically pleasing faucet." *Lund II,* 163 F.3d at 42.

Essentially, this means that Lund must set forth evidence from which a jury could find, by a preponderance of the evidence, that "a substantial portion of the consuming public" [17] views the VOLA as primarily signifying that the product comes from Kroin's business, even if the public does not know the name Kroin. *Boston Beer,* 9 F.3d 175, 182 (1st Cir.1993). "The design must be one that is instantly identified in the mind of the informed viewer" as a Kroin design. *Esercizio,* 944 F.2d at 1240. Moreover, Lund must prove that its design possessed secondary meaning in the minds of the relevant consumers *before* Kohler's allegedly infringing or diluting actions transpired. *Tone Bros., Inc. v. Sysco*

---

**16.** Since Kroin is the sole distributor of the VOLA faucet in the United States, and Kroin does not reference Lund in any of its advertisements or promotional materials, Kroin is the "single" source with which consumers must associate the VOLA design. For this reason, the Court will refer to "Kroin" as the source of the VOLA in discussing secondary meaning.

**17.** The "consuming public" can refer to "a particular trade or 'branch of the purchasing public.'" *Lund II,* 163 F.3d at 42 (citing *President & Trustees of Colby College v. Colby College–New Hampshire,* 508 F.2d 804, 808 (1st Cir.1975)).

*Corp.*, 28 F.3d 1192, 1201 (Fed.Cir.1994); *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 125–26 (4th Cir.1990); *Saratoga Vichy Spring Co. v. Lehman,* 625 F.2d 1037, 1043 (2d Cir.1980); *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1231–32 (3d Cir.1978).

Lund fails, as did Nabisco, if, despite a degree of association between the VOLA design and Kroin, consumers view the VOLA primarily as an aesthetically pleasing or useful faucet design.[18] *See Boston Beer,* 9 F.3d at 182; *Esercizio,* 944 F.2d at 1240. Indeed, Lund is even more vulnerable than Nabisco. It has marketed its design precisely for its beauty, not because it alerted consumers to its source.

### 2. *Proving Secondary Meaning*

■ While secondary meaning may be established in a number of ways, "consumer surveys and testimony are the only direct evidence on this question." *Boston Beer,* 9 F.3d at 182. The Court may also draw inferences from a number of types of circumstantial evidence, including: (1) the length or exclusivity of use of the design; (2) the size or prominence of Lund's enterprise; (3) the nature and extent of advertising and promotion of the design; (4) efforts made to promote a conscious connection, in the public's mind, between the design and the source; (5) the product's established place in the market; and (6) proof of intentional copying. *See Lund II,* 163 F.3d at 42; *Boston Beer,* 9 F.3d at 182.

### 3. *The VOLA Design Is not Distinctive*

In my decision granting Lund's preliminary injunction, I originally found, on a truncated record, that Lund had demonstrated a likelihood of success of showing that the VOLA had achieved secondary meaning, but not confusion. *Lund I,* 11 F.Supp.2d at 121. It then appeared that purchasers of high-end bathroom fixtures, including interior designers, knew the VOLA by sight, and "are moved to purchase the VOLA not just because it looks good, but because its design conveys status related to its unique source." *Id.*

■ To be sure, I am not bound by my findings at the preliminary injunction stage. *TEC Eng'g Corp. v. Budget Molders Supply, Inc.*, 82 F.3d 542, 545 (1st Cir.1996). This is particularly so here because both the law, as described above, and the evidence changed. There are now three consumer surveys constituting the only direct evidence of secondary meaning.

#### a. *Lund's Consumer Surveys*

With respect to Lund's two consumer surveys, I make the following findings: First, assuming that Lund's surveys are reliable evidence of secondary meaning, the surveys conclusively demonstrate that the VOLA has not acquired secondary meaning. The design signifies Kroin to a some consumers while signifying Kohler and other manufacturers to others. Therefore, the evidence does not show that consumers view the product configuration as signaling a single, unique source.[19]

Second, the Court finds that the surveys are insufficient, as a matter of law, as a basis for satisfying the stringent primary significance test. Instead of producing evidence that consumers perceive the VOLA as a primarily signifying source, the surveys provide only unquantifiable and unreliable evidence that there exists some degree of association between the VOLA design and Kroin. Lund does not

---

18. As the Tenth Circuit held in *Vornado Air Sys. v. Duracraft Corp.*, "mere association" between a product's design and its source is insufficient to establish secondary meaning; rather, the "primary significance of the design in the consumer's mind" must be "as a brand identifier." 58 F.3d 1498, 1502 n. 7 (10th Cir.1995).

19. The Court acknowledges that the outcome of the surveys might have been different if Lund had conducted them in 1996. However, the Court places the consequences of the failure to do so at Lund's feet because Lund carries the burden of proof.

meet its burden of proving that this "association" subordinates the functional and aesthetic purposes of the design.

### i. *The Rappeport Survey*

In 1999, Lund commissioned Michael Rappeport, a founding partner of RL Associates, a consumer research and consulting firm, to investigate whether the VOLA had acquired secondary meaning.[20] Rappeport confined his survey to a "major purchase influencing public"—retailers of high-end lavatory products.[21] He defined the specific universe "as salespeople who sell the product to the consumer and/or direct the consumer to the product." Rappeport Rep. at 8. The Court infers that these retailers, as a general rule, are more knowledgeable than the average consumer of high-end plumbing fixtures because the retailers are "members of the trade."

Rappeport discovered retailers' views by employing a methodology known as "mystery shopper survey." *Id.* Interviewers entered a targeted store and behaved like a typical customer looking for a particular product. The salespersons did not know that they were respondents in a survey. Thus, the mystery shopper survey attempts to approximate more closely actual market conditions.

Interviewers handed salespersons one of three photographs, displaying either the VOLA, the Falling Water I, or a control faucet made by Jado. The interviewer asked, "Do you carry this line?" If the salesperson asked the interviewer to clarify what the interviewer meant by the first question, the interviewer would ask, "Do you know who makes this line of faucets?" Based on the salesperson's reactions, the interviewer then asked a series of follow-up questions and recorded the names of the product(s) shown by the salesperson. *Id.* at 9–10. This survey was used in numerous establishments in several cities across the country.

Of the eligible retailers who were shown a picture of the VOLA faucet (ninety-two), only twenty percent correctly identified its source.[22] *Id.* at 18. However, almost as many respondents—eighteen percent—actually believed the VOLA was put out by Kohler. Another ten percent named a manufacturer other than Kroin and Kohler. Thirteen percent of respondents expressed their belief that the VOLA came from one source but could not volunteer a name.

Meanwhile, almost half (forty-four percent) of retailers shown a picture of the

**20.** Michael Rappeport, "Perceptions as to the Source of Various Faucets" (Mar. 30, 2000) *in* Appendix to Plaintiffs' Opposition to Defendants' Four Motions for Summary Judgment, Exh. 6, at 4 [hereinafter "Rappeport Rep."].

**21.** Actual or potential purchasers of high-end faucets are admittedly hard to find, thus it is not improper to *expand* the universe of survey respondents to include salespersons who influence prospective purchasers. *See Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 295 (7th Cir.1998) (when "the relevant market includes both distributors and ultimate purchasers, the state of mind of dealers is important in determining if secondary meaning exists").

**22.** Lund mischaracterizes this twenty percent identification figure as "unaided brand awareness," i.e., brand recognition without prompting. I believe this figure is more appropriately characterized as "aided" brand awareness. Aided brand awareness exists when a person surveyed recognizes a brand when shown the mark or asked about the

mark. For example, aided brand awareness exists where interviewers show respondents the mark "YAHOO" and respondents recognize the mark as representing an Internet search engine. *Cf. Northern Light Technology, Inc. v. Northern Lights Club*, 97 F.Supp.2d 96, 114 n. 19 (D.Mass.2000) ("Aided brand awareness exists when a person polled recognizes the brand Northern Light when asked about it.") By contrast, unaided awareness exists when interviewers ask respondents to name six search engines and respondents volunteer "YAHOO" among those six. Here, Rappeport's interviewers actually showed respondents pictures of the VOLA faucet—the trade dress at issue—and twenty percent of respondents recognized the design as a Kroin faucet. By contrast, unaided brand awareness would exist had interviewers asked, for example, "Name a single-control, wall-mounted lavatory faucet," and *respondents volunteered* "VOLA" or "Kroin" among their answers.

Falling Water I faucet correctly identified the source as Kohler. Rappeport concluded from his survey results that "regardless of the faucet shown (even the Jado), a majority of the retailers believed that one and only one company made a faucet of a given design." *Id.* at 22.

The law does not require the party alleging infringement or dilution to prove that consumers actually know the specific source of a product. *See* 15 U.S.C. § 1127. This so-called "anonymous source" rule protects companies with a valid trademark in cases where the public might not know the plaintiff by name. Thus, it has been said that "[t]o establish secondary meaning, it is not necessary that the public be aware of the identity of the producer, but simply that the public associate the trade dress with a *single* source." *Storck USA, L.P. v. Farley Candy Co.*, 797 F.Supp. 1399, 1406 (N.D.Ill.1992). Here, although respondents are not required to identify a particular source, their answers prove that consumers generally do not associate the VOLA with Kroin. Rather, consumers who associate the design with "one company" often have Lund's competitors in mind.

■ A fifty-percent figure (or higher) for consumer association of a product with one unique source is typically regarded as

sufficient to establish secondary meaning. *Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 394 (7th Cir.1992) ("While a 50-percent figure is regarded as clearly sufficient to establish secondary meaning, a figure in the thirties can only be considered marginal.") Rappeport's survey revealed that sixty-one percent of respondents perceived that the VOLA originated from one source. Rappeport Rep. at 18. But, at most, only thirty-three percent of respondents associated that design with Kroin.[23] The remaining twenty-eight percent of respondents who believed the VOLA came from one source incorrectly identified Kohler or another manufacturer as that source. One-quarter of all retailers did not know whether the trade dress was associated with one or more sources.

There can be no secondary meaning if the majority of consumers surveyed—and knowledgeable ones at that—believed the VOLA came from a single source, but when asked, it became clear that the vast majority of consumers did not associate the design with Kroin.[24] *Cf. Lund II*, 163 F.3d at 43.

In any case, even if these results show some brand identification, it is clear that they do not provide a basis for satisfying the primary significance test. There can

**23.** This thirty-three percent figure is far below the rates at which consumers correctly identified product sources in cases finding secondary meaning for product designs. *E.g., Kohler*, 12 F.3d at 633 ("[A] market research survey of 273 licensed plumbers in six cities revealed that eighty-two percent of those surveyed identified the faucet as a Moen product, and eighty-three percent identified the handles as a Moen product."); *Esercizio*, 944 F.2d at 1240 (finding secondary meaning in Ferrari automobile designs where survey evidence showed "73% properly identified a photograph of Daytona Spyder as manufactured by Ferrari and 82% identified the Testarossa as a Ferrari product").

The Court arrives at the thirty-three percent figure by adding the percentage of respondents who correctly identified the source of VOLA as Kroin to the percentage of respondents who identified the VOLA as coming from one source but did not know the name. Rappeport Rep. at 18.

**24.** For two reasons, the Court finds that this thirty-three percent figure actually overstates the rate at which ordinary consumers of high-end lavatory fittings associate the VOLA with Kroin. First, the retailers are more knowledgeable about the faucet market. Consequently, retailers are able to correctly identify the source of the VOLA faucet more often than the average consumer. Second, Rappeport's two initial survey questions are leading. His interviewers asked, "Do you carry this line?" and "Do you know who makes this line of faucets?" Rappeport Rep. at 9–10. The interviewers suggest to the respondent that the faux customer is asking about a product made by a single source. Kohler rightly points out that, as a result of its leading form, the question does not even provide a reliable measure of consumer association, much less the primary significance of the VOLA design.

be no secondary meaning if the majority of consumers believe the VOLA comes from a single source, but that same majority of consumers, when asked, believes the design primarily signifies an "aesthetically pleasing faucet." *Lund II*, 163 F.3d at 42.

■ In a product configuration case, there is a presumption that the product design does *not* serve as a brand-identifier. *Samara Bros.*, 120 S.Ct. at 1344. To rebut this presumption, Lund must do more than would be required in a word mark or product packaging case. Specifically, Lund must create an evidentiary basis for inferring that the source-identifying function has subordinated its other functions.

Rappeport made no attempt to gauge the primary significance of the VOLA design in the minds of retailers by asking a follow-up question as to relative purposes the design serves. It is entirely possible— more, it is presumed—that all respondents associating the VOLA with plaintiffs' business also perceive the VOLA as primarily signaling a useful or attractive faucet. Against this background, Rappeport's survey provides minute evidence of secondary meaning, if any at all.

### ii. *The Fong Survey*

Lund hired Geoffrey Fong to conduct two surveys in Fall 1999.[25] Fong conducted a secondary meaning survey in New York City and Chicago. If the Court credits the Fong survey, the results also show that only a small percentage of relevant consumers associate the VOLA with faucet designs from one company. In any case,

Fong's survey is flawed in a number of respects.

First, in designing his survey, Fong determined that it was reasonable to assess the level of secondary meaning for the VOLA among a subset of "ordinary" consumers—consumers that would be more likely to be familiar with high-end bathroom faucets. Thus, Fong decided to survey "members of the [interior design and plumbing] trade and ... other individuals who were in the market for high-end faucets." This narrowing of the universe of respondents from "ordinary" consumers was proper because the respondents generally constitute the relevant branch of the "consuming public." *Lund II*, 163 F.3d at 42. Fong achieved this by interviewing individuals at high-end plumbing supply stores and at the Chicago Design Show.[26] Fong Rep. at 50.

From there, Fong then narrowed the sample "[t]o ensure that respondents were familiar with the VOLA faucet ...." *Id.* at 51. Respondents were shown a photograph of the VOLA faucet (without names or identifying information) and asked a screening question: "Are you familiar with the faucet pictured in the photograph?" *Id.* Respondents who answered "No" to this question were not included in Fong's survey results.[27] The reason given for this screening technique was to ensure that the survey was conducted "among respondents who are familiar with the mark or the trade dress. Such individuals would be members of the most relevant universe

---

25. Fong is a member of the Department of Psychology at the University of Waterloo in Ontario, Canada. Geoffrey T. Fong, Ph.D, "Report on the Results of Likelihood of Confusion and Secondary Meaning Surveys" (Mar. 29, 2000), *in* Appendix to Plaintiffs' Opposition to Defendants' Four Motions for Summary Judgment, Exh. 5, at i [hereinafter "Fong Rep."].

26. Out of 110 respondents, seventy-eight respondents (or seventy-five percent) listed their profession as being "in the trade" (e.g., interior designers and architects). Fong Rep. at 61. Twenty-six people (or twenty-five per-

cent) were in an unrelated profession, and the remaining six individuals did not disclose their profession.

27. Fong does not reveal how many respondents were not familiar with the VOLA faucet. Fong Rep. at 54. At the hearing on these motions, Kohler represented that more than seventy percent of respondents did not recognize the VOLA by sight. *See* Transcript of Summary Judgment Hearing, July 19, 2000, at 56. The Court does not have copies of the completed questionnaires to confirm this figure.

because the goal of a secondary meaning survey is to assess *acquired* distinctiveness rather than inherent distinctiveness." *Id.* at 49.

This move was questionable. Fong had already limited the "consuming public" to prospective purchasers of high-end lavatory fittings, including members of the interior design and architectural trade. To further remove anyone who could not identify VOLA by sight stacks the deck in Lund's favor. Indeed, the numbers in this already limited constituency who could not identify the VOLA faucet speaks to the failure of Lund's promotional efforts.[28]

Further, Fong's assistants asked only one question: "Do you associate the design and appearance of this faucet with faucets from one company or with faucets from more than one company?" Of those 110 respondents, sixty-nine (or 62.7 percent) associated the "design and appearance" of the VOLA with faucets from one company.[29] But apart from the distortion in the sample, Fong did not ask any variation of the "primary significance" question. He concluded that a product has acquired secondary meaning when "a significant or substantial portion of the relevant universe

associates the mark with a single source . . . ." Fong Rep. at 48. "Associating" the mark with a single source is not enough if "in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself." *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982). The evidence must also prove that consumers view the VOLA design primarily as a brand-identifier—and not as an aesthetically pleasing or useful faucet design. *Lund II*, 163 F.3d at 42; *Esercizio*, 944 F.2d at 1240.

Evidence that 62.7 percent of respondents *who are already familiar with* the VOLA associate the design with faucets from one company, assuming that percentage is appropriate (see footnote 30, *supra*), simply demonstrates that the trade dress has *some* source-identifying ability and that *some* consumers associate the design with one source. That result does not lend support for the proposition that these same respondents view the design *primarily* as a source-identifier as opposed to an aesthetically pleasing or useful design.[30]

28. Indeed, if Kohler's consumer survey is any indication of how many survey respondents do not recognize the VOLA design by sight, it is likely that Fong excluded more than seventy percent of the relevant consumers from his survey results. When Kohler's expert Ivan Ross conducted a similar study, only sixteen of eighty-six respondents (or 18.6 percent) reported being familiar with the VOLA faucet on sight. Ivan Ross, Ph.D., "Report on Rebuttal Studies of (1) Secondary Meaning of VOLA 111C Faucet and (2) Likelihood of Confusion between VOLA 111C and Kohler Falling Water I Faucets" (April 20, 2000), *in* Appendix to Plaintiffs' Opposition to Defendants' Four Motions for Summary Judgment, Exh. 7, at 12 [hereinafter "Ross Rep."]. Taking a seventy-percent exclusion figure as a conservative estimate, it becomes clear that Fong's results showing that 62.7 percent of respondents associated the design and appearance of the VOLA with faucets from one company does not really equate to 62.7 percent of the consuming public at all. A more accurate figure would probably be in the area of nineteen percent (i.e., sixty-three percent of

a group that only represents thirty percent of consumers).

29. However, respondents who were not "in the trade" (twenty-six) exhibited a much lower rate (42.3 percent) of single-source identification. These respondents are the prospective purchasers of the VOLA faucet, and the evidence must show that it is among these consumers that the VOLA has acquired secondary meaning.

30. In a product configuration trade dress case, this Court is extremely skeptical of a consumer survey that merely asks whether consumers "associate" a faucet design with faucets from one company or with faucets from more than one company. It seems obvious that many individuals, when confronted with a photograph of a single faucet design (and a wall-mounted one at that), will believe the design emanated from a single source. Rappeport's survey essentially confirmed the Court's suspicion when it concluded, "regardless of the faucet shown (even the Jado [control faucet]), a majority of the retailers be-

In fact, even the "association" finding is flawed. Fong's survey fails to show whether its respondents associate the VOLA with the *same* specific source, Kroin, or with other manufacturers as well. *Cf. Boston Beer*, 9 F.3d at 182. Fong did not ask the sixty-nine respondents who associated the VOLA with faucets from one company to identify that "one company" to determine whether respondents associated the VOLA specifically with Kroin (or with one unique but anonymous source).[31] This is a glaring error because the evidence must show that the trade dress has " 'come through use to be uniquely associated with a specific source,' " even if consumers do not know that source by name. *Two Pesos*, 505 U.S. at 766 n. 4, 112 S.Ct. 2753 (citing *Restatement (Third) of Unfair Competition* § 13, cmt. e (Tent. Draft No. 2, Mar. 23, 1990)). There can be no secondary meaning if the majority of consumers believe the VOLA comes from a single source, but individual consumers, when asked, associate the VOLA with manufacturers other than Lund. *Cf. Lund II*, 163 F.3d at 43; *United States Blind Stitch Mach. Corp. v. Union Special Mach. Co.*, 287 F.Supp. 468, 471 (S.D.N.Y.1968).

### b. *Kohler's Consumer Survey*

Kohler hired Ivan Ross as a rebuttal expert to conduct a consumer survey test-

ing for secondary meaning. Like Lund's experts, Ross conducted his surveys several years after the relevant time period, in April 2000. Ross essentially replicated Fong's study of secondary meaning, with some important modifications. The purpose of the modifications "was to test the proposition that Dr. Fong would have found different results had he conducted his study with these modifications." Ross Rep. at 2.

Interviewing was conducted in five stores, each in different states, that sold wall-mounted and "high-end" faucets, including Kohler faucets. Ross showed respondents actual faucets, as opposed to photographs, with the name of the source masked. *Id.* at 7. The respondents were then asked if they were familiar with the faucet. Regardless of whether the respondent indicated familiarity with the VOLA faucet, the respondents were asked the follow-up questions. Like Fong, Ross next asked whether the respondents associated "the design and appearance of this faucet with faucets from *one company*, or with faucets from *more than one company?* " *Id.* at 21. Ross then asked a question that Fong did not ask:

> As you look at this faucet, which of the following reasons do you think primarily describes why it looks the way it does?

---

lieved that one and only one company made a faucet of a given design." Rappeport Rep. at 22. The Court appreciates Lund's reasons for avoiding more probative questions for fear of proving too much, as happened here.

**31.** Lund argues that authority from other courts may be read to accept Fong's generic "one company" question as probative evidence of secondary meaning in product configuration cases. *See Stuart Hall Co. v. Ampad Corp.*, 51 F.3d 780, 789 (8th Cir.1995) ("We remind the district court that Stuart Hall need not show that consumers know their name; the showing required is that consumers associate the trade dress with a single source."); *Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*, 998 F.Supp. 757, 762 (granting summary judgment where plaintiff failed to establish secondary meaning under *Stuart Hall* formulation). As an initial matter, the Court notes that the showing required

is *not* merely "that consumers associate the trade dress with a single source." This association test does not equate to the more stringent "primary significance" test first established in *Kellogg*, and applicable here. The relevant test is that consumers view the trade dress as primarily serving to identify the product's source. *See Lund II*, 163 F.3d at 42. The Court cannot agree that an answer to Fong's "one company" question, without further explanation, can shed any light on the issue of secondary meaning in a product configuration trade dress case. In a case such as this, where consumers may view any given faucet as "a single thing coming from a single source" but where follow-up questions reveal that even the most knowledgeable respondents are not identifying the faucet with the *same* unique source, the one simple question is insufficient.

- To tell you who made it or put it out.
- To present a pleasing design or appearance or to make the product more useful.
- Primarily for some other reason.

*Id.*

Lund questions the value of this last question, arguing that it appears to ask for the consumer's perception of the producer's *intent* in designing the product rather than the consumer's perception of the design's significance. As the First Circuit has made clear, the producer's intent is entitled "to little weight" in evaluating secondary meaning. *Lund II*, 163 F.3d at 43.

The Court does not share Lund's view that this question has failed to test for secondary meaning. Kohler's rephrasing of the relevant question plainly comes closer to the question raised in *Samara Brothers. See* 120 S.Ct. at 1344 ("Consumers are aware . . . that, almost invariably, even the most unusual product designs . . . is *intended* not to identify the source, but to render the product itself more useful or more appealing.") The question attempts to get at consumer *perceptions* of the purposes served by the VOLA faucet design. As the logic behind *Samara Brothers* predicts, consumers perceive the design as primarily signaling the design's aesthetic and utilitarian value.

Ross reports that a majority of all survey respondents (fifty-five percent) associated the VOLA faucet with faucets from more than one company. Ross Rep. at 12. The remaining forty-five percent associated the faucet with faucets from one company.[32] Only six percent of respondents believed the VOLA came from one company *and* that the design looks the way it does primarily to "tell you who made it or put it out." *Id.*

Taken together, the Court finds that a reasonable jury could not conclude that the three consumer surveys prove the VOLA

faucet has acquired secondary meaning. Although the Court need not review the indirect evidence in light of consumers' documented views, consideration of the remaining evidence underscores the Court's finding of no secondary meaning.

### c. Circumstantial Evidence of Secondary Meaning

The Court may draw inferences as to secondary meaning from a number of types of circumstantial evidence, including: (1) the length or exclusivity of use of the design; (2) the size or prominence of Lund's enterprise; (3) the nature and extent of advertising and promotion of the design; (4) efforts made to promote a conscious connection, in the public's mind, between the design and the source; (5) the product's established place in the market; and (6) proof of intentional copying. *See Lund II*, 163 F.3d at 42; *Boston Beer,* 9 F.3d at 182. Consideration of these factors conclusively demonstrates that there is no evidentiary basis from which a jury could find that the VOLA has acquired secondary meaning.

### i. Length and Exclusivity of Use of Design

It is clear that the best, perhaps only, evidence of secondary meaning in this case is Lund's long and exclusive use of the VOLA design. For more than twenty years Lund exclusively used the VOLA design in the United States.

"Trademark law has long embraced the tenet that five years of continuous and exclusive use of a mark or trade dress generates a presumption of secondary meaning." *Yankee Candle,* 99 F.Supp.2d at 154. While Lund's evidence of long and exclusive use provides some evidence in favor of secondary meaning, that evidence is not sufficient. *See Kellogg,* 305 U.S. at 118–19, 59 S.Ct. 109.

As described above, to a degree, it counts against Lund.

---

**32.** This lower "association" figure confirms that Fong's results overstated the actual level of single-source association among *both* respondents who reported they were familiar with the VOLA and those who were unfamiliar with the faucet.

### ii. Size or Prominence of Lund's Enterprise

In 1995, the year before the Falling Water I went on the market (February 1996), Lund sold only 866 VOLA faucets in the entire United States. Since 1995, Lund has sold anywhere from 972 to more than 1800 faucets in a given year. This is not a large or notably prominent enterprise in the United States, even among the subset of consumers involved in home renovations.

Even if the Court inferred that the VOLA achieved design icon status, and that it is firmly established in the sanitary fittings market, this factor does not provide a basis for a finding of secondary meaning. The VOLA has consistently increased in sales over the last six years, and may continue to do so, but this does not counteract evidence that the design did not achieve secondary meaning. Indeed, "market success may well be attributable to the desirability of the product configuration rather than the source-designating feature or combination of features." *Duraco Prods., Inc. v. Joy Plastic Enters.*, 40 F.3d 1431, 1452 (3d Cir.1994) [hereinafter "*Duraco*"].

### iii. Advertising and Efforts Made to Promote a Conscious Connection Between the Design and the Source

"[A]dvertising which encourages consumers to identify the claimed trade dress with the particular producer is some evidence of secondary meaning." *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 292 (7th Cir.1998). As the Seventh Circuit has noted:

> Advertising that touts a product feature for its desirable qualities and not primarily as a way to distinguish the producer's brand is not only not evidence that the feature has acquired secondary meaning, it directly undermines such a finding. It supports instead the inference that consumers consider the claimed trade dress a desirable feature of the product and not primarily a signifier of source.

*Thomas & Betts Corp. v. Panduit Corp.*, 65 F.3d 654, 662 (7th Cir.1995). Thus, it is the nature of Lund's advertising, more so than the amount, which may provide a basis for a finding of secondary meaning. Here, the evidence shows that Lund promoted the aesthetically pleasing and utilitarian features of its VOLA faucet rather than promoting it as a brand identifier.

Since 1988, Kroin has spent over $684,000 to promote VOLA fittings in the United States, including over $443,000 on magazine advertising in prestigious American design magazines such as *Architectural Record*, *Interior Design*, and *Interiors*. (This advertising figure did not go toward promoting the 111C faucet alone, but the whole line of VOLA fittings.) Kroin has even won awards and recognition for the distinctiveness and effectiveness of its advertising campaign.

The advertisements themselves, however, draw consumer attention to the aesthetic and utilitarian design aspects of the VOLA, rather than its brand identification. For example, an *Interior Design* ad run in 1996 states that the products pictured, which include the 111C faucet, are "manufactured with the utmost attention to detail and function" and "each design is an understated expression of simplicity and timelessness." Kohler App.; Exh. 6. The emphasis is primarily on the usefulness and attractiveness of the products.

In its Opposition, Lund points to testimony from various individuals who conclude that Kroin's advertising promotes a conscious connection between the VOLA faucet and its source. *See* Lund Opp. at 39–40. But their conclusory statements are not adequate. It is the *nature* of the advertising itself and its *success* in promoting brand-identification—not how one or more individuals perceive it—that determines whether the advertising actually promotes brand-identification. As the court noted in *Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.* on this issue:

[T]he opinions reached by plaintiff's experts in the design field are not representative of the average consumer and are not based on any articulated factual foundation. Plaintiff must establish that the primary significance of the alleged trade dress in the minds of the consuming public is not the product, but rather the producer. Conclusory affidavits by experts in the field do not meet that burden of proof.

998 F.Supp. 757, 762 (E.D.Mich.1998).

The truly devastating blow in the form of circumstantial evidence comes from Lund's own advertisements which associate the design with many different retailers and sources, and sometimes with no source at all. The First Circuit has noted, and it remains true, that the evidence in this case shows that the VOLA has been sold by "a number of different companies in this country and has not been advertised here as coming from Lund." *Lund II*, 163 F.3d at 42. It is difficult for Lund to prove the acquisition of secondary meaning where the product design is sold by the authority of Lund under several different word marks.[33] *See id.*

Lund also points to unsolicited advertising of the VOLA paid for by retailers, magazine editors, and museums. Lund Opp. at 42–25. "Regarding the 'unsolicited media coverage' cited by plaintiff, that evidence 'reflect[s] interest more in an unusual product [or individual] than in the source of the product.'" *Herman Miller*,

998 F.Supp. at 762 (citing *Duraco*, 40 F.3d at 1453). The faucet is also displayed in the Museum of Modern Art in New York City as the "VOLA" faucet with Jacobsen's name attached. Lund Opp. at 83. The name Kroin does not appear in the faucet's display. Most importantly, the product is labeled with the mark "VOLA" on the handle even though its sole source in the United States is Kroin. Kohler App., Exh. 36 at 54.

"It is true that the VOLA product has been much advertised or featured, but at times without any source attribution or with attribution to different sources." *Lund II*, 163 F.3d at 43. This is the most damaging circumstantial evidence to Lund's case. It effectively prevents plaintiffs from establishing secondary meaning in the absence of probative survey evidence to the contrary.

#### iv. The Product's Established Place in the Market

No evidence of market share has been presented to the Court. However, the clear implication from the evidence and representations of the parties is that Lund's market share is insignificant.

#### v. Proof of Intentional Copying

Proof of intentional copying may also be considered as evidence of secondary meaning. *Id.* at 42; *Esercizio*, 944 F.2d at 1239. To prove intentional copying, Lund must show that Kohler intentionally copied

---

**33.** For example, the VOLA has been marketed in several advertisements simultaneously under two names—Kroin *and* Vitra Form. One such ad states:

> Kroin and Vitra Form, two independent companies dedicated to craftsmanship and progressive design, have introduced a comprehensive series of products, manufactured with the utmost attention to detail and function. The result of this collaboration is a program of sanitary fittings, glass basins and sinks with integral countertops, available in a variety of colors and finishes for residential and commercial use.

Kohler App., Exhs. 10–11. The ad never identifies Lund or Kroin as the sole manufacturer of the VOLA faucet, which is prominent-

ly displayed in several pictures in the ad. Moreover, the ad gives the distinct impression that the VOLA is the product of "collaboration" between "two independent companies"—not one company, Kroin.

More importantly, the VOLA design is prominently displayed in advertisements identified with at least six sources other than Kroin in which Kroin's name does not appear at all. These other sources include Cherry Creek, Davis & Warshow, Inc., Alchemy, Hastings, and Bates & Bates. Kohler App., Exhs. 14–15, 19, 21, 23, 25–26. Although these other sources primarily consist of retailers, as opposed to manufacturers, the advertisements do not promote brand-identification of the VOLA fittings.

"down to the smallest detail" the VOLA faucet design. *TEC Eng'g Corp. v. Budget Molders Supply, Inc.*, 927 F.Supp. 528, 534 (D.Mass.1996).

The evidence does not show that Kohler slavishly copied the VOLA. Indeed, there are quite obvious differences between the VOLA and the Falling Water I, not the least of which is the display of the name "Kohler" on the Falling Water I. Here, the evidence shows Kohler has exercised reasonable care to inform the public of the source of its product.

To the extent that Kohler "copied" certain elements of the VOLA design, the copying does not constitute the "precise copying" which yields a nearly identical product, as found in other cases. *See Esercizio*, 944 F.2d at 1239 (finding "precise copying" where car manufacturer reproduced "the whole body" of a Ferrari automobile, including use of Ferrari's prancing horse logo and the model name "Testarossa"); *M. Kramer Mfg. Co. v. Andrews*, 783 F.2d 421, 449 (4th Cir.1986) ("Other than slight differences in color and shadings, which result from slight changes in the silkscreening process, the two glass frontpieces are identical.") Even had Kohler intended to copy the product configuration, the evidence would not be very probative: "[T]he copier may very well be exploiting a particularly desirable feature, rather than seeking to confuse consumers as to the source of the product." *Duraco*, 40 F.3d at 1453. Thus, the alleged copying provides no basis for a finding of secondary meaning, especially given the failure of the survey evidence to show source linkage between Kroin and its product.

In sum, the evidence presented proves Lund cannot make a successful case for secondary meaning in its VOLA faucet. As secondary meaning is an essential element of Lund's Lanham Act claims, Kohler is entitled to summary judgment on Counts I–III of the Amended and Supplemental Complaint. The Court need not address the remaining elements of Lund's federal claims (i.e., likelihood of confusion, fame).

### E. State Law Claims

In Counts IV–XIII, Lund brings several state dilution claims, as well as claims for unfair and deceptive trade practices.[34] As to the dilution and "palming off" allegations, distinctiveness is an essential element of the state unfair competition claims. *See Astra Pharmaceutical Products, Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1209 (1st Cir.1983); *International Order of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912, 916 (9th Cir.1980) (citing cases from several circuits). Thus, defendants are entitled to judgment as a matter of law on Counts IV–VIII as result of Lund's failure to prove distinctiveness of the VOLA.

As to the remaining state law claims alleging unfair competition on grounds that do not require proof of distinctiveness (Counts IX–XIII), both parties failed to adequately brief these claims. The briefs do not even state the essential elements of the five claims, nor do they draw the Court's attention to the evidence that may support or undermine the claims. The Court notes that several of the statutes appear to require proof of "substantial injury" to Lund, and that evidence of injury does appear to be lacking in this case.

---

**34.** Lund's Amended and Supplemental Complaint states the following claims: Count IV, dilution under Cal. Bus. & Prof.Code § 14330 (West 2000); Count V, dilution under Ga. Code Ann. § 10–1–451(b) (1999); Count VI, dilution under 765 Ill. Comp. Stat. Ann. 1036/65 (West 2000); Count VII, dilution under Tex. Bus. & Com.Code Ann. § 16.29 (West 2000); Count VIII, dilution under N.Y. Gen. Bus. Law § 360–1 (McKinney 2000); Counts IX–X, unfair competition under Mass. Gen. Laws Ann. ch. 93A §§ 2 and 11 (West 2000); Count XI, unfair competition under Cal. Bus. & Prof.Code §§ 17000 et seq. (West, 2000); Count XII, unfair competition under 815 Ill. Comp. Stat. Ann. 505/1 et seq. and 51¾ et seq. (West 2000); Count XIII, unfair competition under N.Y. Gen. Bus. Law § 349 (McKinney 2000).

E.g., *PMP Associates, Inc. v. Globe News-paper Co.*, 366 Mass. 593, 596, 321 N.E.2d 915, 917 (1975); *Gaidon v. Guardian Life Ins. Co. of America*, 272 A.D.2d 60, 707 N.Y.S.2d 166, 167 (N.Y.App.Div.2000). However, the Court cannot make an informed decision as to the remaining counts on the basis of the record before it. The parties have until November 2, 2000, to file additional materials as to the state statutory claims which do not require a finding of secondary meaning.

## IV. CONCLUSION

For the reasons stated above, I find that there exists no genuine issue of material fact as to the VOLA's distinctiveness. No reasonable jury could find that Lund's faucet design has acquired secondary meaning such that it is entitled to protection as trade dress. Therefore, Kohler's motions for summary judgment as to Counts I–VIII are **GRANTED**.

**SO ORDERED.**